Filed 10/29/20  P. v. Jacobs CA5
See concurring & dissenting opinion

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY JACOBS et al.,<br><br>Defendants and Appellants. | F076948<br><br>(Super. Ct. Nos. 17CMS0951A,<br>17CMS0951B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Thomas DeSantos, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Jacobs.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Darrien Washington.

Xavier Becerra, Attorney General, Lance E. Winters and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Eric L. Christoffersen, and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Anthony Jacobs and Darrien Washington (respectively, Jacobs and Washington; collectively, defendants) stand convicted, following a jury trial, as follows:

*Counts 1 and 2*: Premeditated attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664) committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)), and in the commission of which each defendant personally used and discharged, and a principal used and discharged, a firearm, proximately causing great bodily injury (§ 12022.53, subds. (b)-(e)(1));

*Counts 3 and 4*: Assault with a firearm (§ 245, subd. (a)(2)) committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)), and in the commission of which each defendant personally used a firearm (§ 12022.5, subd. (a))[2];

*Count 5*: Shooting at an occupied vehicle (§ 246) for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)), and in the commission of which each defendant personally used and discharged, and a principal used and discharged, a firearm, proximately causing great bodily injury (§ 12022.53, subds. (b)-(e)(1)); and

*Count 6*: Active participation in a criminal street gang (§ 186.22, subd. (a)).

In addition, Washington was convicted, in count 7, of being an ex-felon in possession of a firearm (§ 29800, subd. (a)(1)), and he admitted having suffered a prior conviction for a serious felony that was also a strike (§§ 667, subds. (a)-(i), 1170.12, subds. (a)-(d)).

Defendants were sentenced to lengthy prison terms, and ordered to pay various fees, fines, and assessments. On appeal, they raise numerous claims involving sufficiency of the evidence, admission of evidence, jury instructions, and sentencing. We

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

[2]     Jurors found not true allegations defendants personally inflicted great bodily injury (§ 12022.7, subds. (a) & (d)) with respect to counts 3 and 4.

2.

hold:  (1) Substantial evidence supports all challenged convictions and enhancements; (2) Washington's challenge to admission of his prior conviction was forfeited by his failure to object at trial; (3) Defendants are not entitled to reversal for lack of instruction on lesser included offenses on counts 1, 2, and 5; or for lack of a unanimity instruction with respect to the identity of the shooter on counts 1 through 5; (4) Defendants are entitled to a remand to have the trial court exercise discretion with respect to the various firearm enhancements, and Washington is entitled to have the court exercise its new discretion to strike the section 667, subdivision (a) enhancement; (5) Defendants are not entitled to a remand to present evidence and make a record of information relevant to their youth offender parole hearings, because Jacobs had the opportunity to do so and Washington is ineligible for such a parole hearing; and Washington's related equal protection claim lacks merit, and his cruel and/or unusual punishment claim is premature; and (6) Defendants forfeited their challenge to the imposition of monetary obligations by failing to object in the trial court; however, we will modify Jacobs's judgment with respect to the amount of the court operations assessment (§ 1465.8) and the court facilities funding assessment (Gov. Code, § 70373), which were miscalculated. Accordingly, as to Jacobs, we affirm the judgment as so modified.  As to Washington, we affirm the judgment.  We remand the matter to the trial court with directions to exercise its discretion, as to both defendants, whether to strike any of the firearm enhancements and, as to Washington, whether to strike one or more of the section 667, subdivision (a) enhancements.

# FACTS[3]

## I

### PROSECUTION EVIDENCE

### *The Gang Expert's Background Testimony*

Hanford Police Investigator Estrada, a member of the Gang Task Force, testified that status is important to gangs. In a traditional gang, higher status means receiving more money from the gang's business operations. In a loosely-knit gang, someone with status gets to "call the shots." African-American gangs in Kings County, which typically are Crip gangs, are not well organized or run the same way as traditional gangs.

Estrada explained that the Crip gang in Hanford has subsets, such as Hanford Gangster Crips (often called HGC), H-Mob, and Eight Trey Gangsters. The primary activities of the Hanford Gangster Crips include selling narcotics and illegally possessing firearms. The gang's primary rules are making money and no snitching, even on rival gang members, and even if someone has been badly hurt (a rule found in almost every gang). Testifying is considered "the ultimate snitching," and is not allowed.

Crips claim the color blue; often refer to each other as "Cuz" or "C"; have as common signs "C" or "GC"; use "moovin" as a motivational term; and identify with the numbers "3," "3rd," or "3X." Bloods are rivals of Crips, and "BK" means "Blood Killer." Derogatory terms for Crips include "Crab" and "Smurf." "CK," means "Crip Killer." According to Estrada, Kings County does not have many Bloods. Instead, it is a northern-gang-member-dominated county; hence, the Crips' main rivals are the Norteños.

Crips in Kings County associate with the 600 gang. This is a newer gang that is proud of the fact they "took the fight to the Northerners." They are militant (which to

---

**3**      Pursuant to rule 8.90 of the California Rules of Court, we refer to some persons by their first names and/or initials. No disrespect is intended.

     Unspecified dates in the statement of facts are from the year 2017.

them means "[a]ctively aggressive"), and are known for robbery and human trafficking. In addition, one of their primary activities is witness intimidation or dissuasion. They wear army green camouflage, and identify with the numbers "6" or "6-4." Their territory is in the 600 South Redington area, while Crips' territory is "the same width" with a "heavier selection" off Irwin, in apartments known as the Little Kings Terrace (Little KT's). The area is known for violence.

Estrada explained that a gang's "turf" or territory is where the gang lives and conducts its illegal activities, so it is the area the gang protects. When a rival gang member walks through the territory, it is a sign of disrespect. It may also be the beginning of the rival gang trying to "push in" on the territory in order to take over the illegal activities there. The Crips and 600's use violence to protect their turf, including the Little KT's. If gang members feel disrespected, they will physically assault a rival gang member. They are more likely to attack if there are more of them than the rival. Status is gained by attacking. Not retaliating for a sign of disrespect is a sign of weakness.

Estrada estimated that as of April, there were approximately 70 to 75 active Hanford Gangster Crips, and about 50 active 600's. In Kings County as a whole, there were approximately 2,000 to 2,500 active Northerners.

*Testimony Concerning the Shootings*

On April 21, Alejandro G. resided on the south side of Hanford, fairly close to Scott and Redington Streets.[4] That day, he and a friend were walking from the other side

---

**4** At trial, Alejandro testified that he did not want to be in court and did not recall being shot. He did recall talking to Estrada and Hanford Police Investigator Amador at the hospital, however, and he stated he was truthful with them. Amador interviewed Alejandro a second time on May 5, after Alejandro's girlfriend had asked Alejandro to be truthful with Amador. A recording of that interview was played for the jury and is the basis for our summary of Alejandro's version of events.

During the May 5 interview, Alejandro identified Jacobs from a photographic lineup, but was unable to identify Washington. He also provided Amador with three

of town. They passed the Little KT's, where a group of African-Americans were "kickin' it." When Alejandro walked past, they all grew quiet and looked at him.

As Alejandro continued walking, he felt somebody behind him. He put his hands up and walked off the other way. People started running toward him. He did not know what they had in their hands, but he and his friend kept walking quickly.

When Alejandro and his friend turned a corner, "Stoney" — Jacobs — was waiting. A tall, skinny Black man who looked to be in his early 20's and who was wearing a black hoodie was with him.[5] People were coming at Alejandro from two directions, and he felt they were trying to trap him and his companion. One of Alejandro's friends came out to help Alejandro.[6] The friend took off his shirt. The African-Americans were saying "600 nigga this and that." Alejandro did not say anything gang related, but responded, "fuck you mother fuckers."[7] He told them there were children there, so they should have respect and "take this shit somewhere else." He was expecting a fist fight. Some people who lived on the block came out to help him. He estimated there were four on his side and nine to 11 in the other group.

---

different photographs of Jacobs that he had obtained from social media. Washington was in one of the photographs. In that photograph, Jacobs was making the hand sign for 600, while Washington was holding up three fingers for Eight Trey.

Alejandro testified at trial that Washington was not at the scene of the shooting. He also testified that when he identified Jacobs, he was on medication and did not have a good memory. He did not know who shot him. According to Amador, however, Alejandro did not appear to be confused or heavily medicated at the time of the May 5 interview. Initially, he was resistive to giving information and possibly was scared.

[5] Amador described Washington as tall and thin.

[6] There were houses and apartments in the area.

[7] At trial, Alejandro denied ever having any association with the Norteño criminal street gang. He admitted he had four dots tattooed on his hand, however. Estrada determined that Alejandro was a Norteño.

6.

The groups were about to fight when Jacobs pulled a chrome .45-caliber pistol from his waistband in the back. First he shot someone whom Alejandro variously described as jumping out or reaching out in front of Alejandro or as running toward Alejandro. This person, who was shot in the side, took the bullet for Alejandro, although Alejandro did not know who he was.[8] Jacobs fired again and shot Alejandro in the leg. Alejandro did not feel anything and started to run. He was losing a lot of blood, and one of his friends picked him up and put him to the side.[9] Jacobs fired four to seven times. First he fired one shot, then the second shot, then "he let the whole clip go." The African-Americans took off running. Some of them were picked up by a blue truck with a lawn mower in the back, while others got into a gray or black car.[10]

R.B. and J.C. lived in an apartment complex south of Scott and Redington Streets. Around 7:00 p.m., they were in the parking lot, and R.B. was holding J.C.'s daughter, four-year-old C., when J.C. heard a loud, heated argument between two people. She and R.B. then heard multiple gunshots. They sounded to J.C. as if they were very close by. R.B. thought they came from the other side of a fence.

---

[8]     This person was Pablo M., who did not testify at trial. Pablo was struck in the hip. The bullet cracked his pelvis and chipped a piece off the top of his femur.

[9]     Alejandro was struck on the outside of his lower right leg. The bullet broke both bones of the leg. Surgery was required to remove bullet fragments and insert a plate to stabilize one of the bones while it healed.

[10]     At some point on the evening of April 21, Jacobs telephoned his mother, who had a small white car, and asked her to pick him up. She did so in front of some apartments, possibly on Irwin Street. Two other young men were with Jacobs, and Jacobs's mother picked them up as well. She thought one was Washington. Later, when Jacobs and his mother were alone in the car, Jacobs said he had gotten into an argument with someone who said, "this is north," or something to that effect. Someone pulled a knife, and Jacobs backed away, then his mother arrived and Jacobs got in the car.

Jacobs had told his mother "[p]oint blank period" that he was not a gang member. His mother explained that Jacobs's nickname was "Stone," because that was her grandmother's last name. When the grandmother passed away in 2014, the males of the family started using "Stone" as a nickname as a tribute to her.

Something struck R.B., and he turned and ran back toward their apartment, away from the gunfire. There were a lot of other adults and children around. The children were crying and screaming. C. complained of pain, and R.B. discovered blood and a bruise on the side of her chest. The physician who treated her at the hospital found the injury to be consistent with being grazed by a bullet. Afterward, C. was in pain for about a week. As of the time of trial, she had a healed scar across her chest.

Eric C. was leaving a neighborhood store when the shooting occurred. His two young sons were with him. Eric's truck was at the corner immediately before Redington when Eric heard the first shot. There was no turning back, so he pushed his youngest son's head down, "punched" his truck, and tried to get out of there as fast as he could. He did not see anyone, but he heard five or six shots. He ended up with a bullet hole in the trim of the truck door, about neck- or chin-high to him. There was no exit hole.

At approximately 7:19 p.m. on April 21, Hanford Police Officer Jaime was dispatched to the area of South Redington and Scott Streets, in response to a call that four to five shots had been fired in that area. Upon arrival, Jaime saw a lot of people standing in the area of the intersection. He was told there were two shooting victims "down the street a little ways." Jaime then came in contact with Alejandro and Pablo on Scott Street, near the intersection.[11] During the ensuing investigation, eight .40-caliber shell casings were found on Redington Street, north of Scott Street. They were spread out almost in a line approximately 10 to 15 feet long. Subsequent testing showed they all came from one gun. A trail of blood ran west on Scott from the corner of Redington and Scott.

After Alejandro and Pablo were transported by emergency medical personnel, Jaime was told by a bystander that a five-year-old girl possibly had been shot. Jaime

---

[11]     Video footage of the encounter that was taken from Jaime's body camera was played for the jury.

made contact with the child, D., on the sidewalk in the back parking lot of an apartment complex on Scott Street just south of Redington. There was a fence nearby. D. had an abrasion or scratch on the top of her right shoulder. The emergency room nurse who treated D. found the injury to be consistent with being struck by a fragment of a projectile. Further investigation revealed both C. and D. were struck when a projectile traveling southbound went through the fence.

Estrada responded to the Little KT's in response to the shooting call. When he arrived at approximately 7:20 p.m., he came in contact with Cristian M., who was wearing a black hoodie. Estrada, who had previously met Cristian, searched him for weapons, but found none.

On April 28, Estrada interviewed Cristian, who was 13 years old at the time.[12] During the interview, Cristian was shown a photographic lineup and identified a picture of Washington, whom he knew as "Lil Dub" and who he said did the shooting. Cristian believed Washington was a Crip from HGC. Cristian described him as tall and skinny, and wearing a grey jacket at the time of the shooting.

At first, Cristian denied any involvement and gave Estrada an account of his activities that placed him at the Little KT complex when he heard gunshots. At that point, Estrada showed Cristian a still frame from surveillance video that showed Cristian running from the scene. Estrada told Cristian that a little girl was hit by one of the bullets

---

[12]     At trial, Cristian denied being a gang member, knowing any gang members, or knowing what the 600 street gang was, although he had heard of the Norteño criminal street gang. He denied knowing either defendant or having ever been to the area in the vicinity of the Little KT's. He also denied being on the south side of Hanford in April, knowing anything about a shooting at Scott and Redington Streets, being interviewed by Estrada on April 28, and identifying someone in a photographic lineup. A recording of the interview was played for the jury. At trial, Cristian denied his voice was on the recording. At the preliminary hearing, however, Cristian testified that he did talk to Estrada on April 28, and that his statement to Estrada was true. Cristian also testified at the preliminary hearing that he was a 600 member.

and Cristian was going to "take the rap" for it.  At that point, Cristian explained to Estrada that he was at the Little KT's when the incident started.  It was sparked by two Northerners walking by.  Cristian did not know they were Northerners until Washington said those were " 'Nortes' " who were coming.  Cristian did not feel disrespected by them walking past, but other people did.  Cristian, who had been "hittin' . . . South Side," did not want to go, but Washington called him a bitch and told him to come on.[13]

Washington, Jacobs (whom Cristian knew as "Stone"), Cristian, and Drake W. ran after the Northerners.  Cristian went by way of Davis Street, while Drake and somebody — Cristian thought it was Jacobs — continued down Irwin to Scott.  At some point, Washington started reaching for his waistband.  Cristian thought he was probably going to pull something out.  Cristian thought Washington had a knife, because Cristian had seen him carry a knife before.

Cristian dropped his pace from a run to a walk, because he did not want to be close to whatever Washington was doing.  Washington was already at the corner, but Cristian stopped down the street a ways.  There were other Crips and Norteños present.[14]  There was an argument, with gang names and signs said and thrown by both sides.  Jacobs moved up a bit like he was going to fight "Smokes," one of the Northerners, but then

---

[13]     According to Cristian, 600's were not a Crips set, but were their own gang.  Crips were considered higher, however, because they had been around longer and had "more rank in."  Cristian was "low key forced . . . to go."  Had he refused, he would have been beaten up.

[14]     One of the Northerners who had walked past the Little KT's took off his T-shirt when he was in front of some apartments on Scott.  He pointed at his back, across which "South Side Locs" was tattooed.  Cristian did not know if he was one of the people who was shot.  Although only two Northerners had walked past the Little KT's, Cristian estimated there were seven or eight present by the time of the shooting.

Surveillance video confirmed Cristian ran, then walked, and then stopped short of the location of the shooting.

Smokes pulled out a large knife and Jacobs backed up.[15] Washington said, "fuck Norte," and started shooting. He was the only one who had the gun. Cristian did not know the caliber of the gun, but it looked to him like a .40- or .45-caliber gun of the type that had a clip. Washington pulled it from his waistband. It was black. Cristian denied knowing, before the shooting started, that anyone had a gun. He thought they were just going to fight with the Northerners.

After the shots were fired, Washington and the others ran in Cristian's direction. He ran before they did, and returned to the Little KT's. Cristian did not know where the others went, but Jacobs and Drake got into separate white cars.

The police obtained surveillance video from the store at the corner where the shooting occurred (the same store at which Eric C. had been) and another location. The video from the second location (which was played for the jury) showed Alejandro and his companion approaching the area of the Little KT's parking lot. There were people in vehicles in the lot, and a group of people came out from the apartment complex. Alejandro was talking to someone, and Washington came out. A short time later, Cristian could be seen speaking with Washington. When Alejandro was at Irwin and Davis Streets, directly south of the Little KT's, people started running. Some were wearing articles of camouflage-patterned clothing. In Amador's opinion based on the collection of interviews and videos, defendants were there, as were Cristian and a fourth individual who was never identified. Washington was in front, "leading the pack." Some of the group split off and pursued Alejandro southbound on Irwin Street, while defendants and Cristian flanked him and came across Davis Street toward Redington. Alejandro continued south to Scott Street, where he turned west. The store video (which was also played for the jury) showed Eric C.'s truck, as well as subjects meeting toward

---

[15] Estrada believed Smokes was Pablo M.'s son.

11.

the corner. Alejandro and Pablo were among them. The shooting then took place. After the shooting, everyone fled.

Defendants were apprehended at Washington's residence in Lemoore on April 30. Once in custody, both were housed in the jail pod for African-American gang members. Both "programmed" with Crips and 600's.

<em>The Gang Expert's Opinions</em>

Estrada opined that Washington was a Hanford Gangster Crip, Jacobs was a member of the 600 gang, and each was an active participant in his respective gang. Estrada opined the crimes benefited the Hanford Gangster Crips and promoted their lifestyle and conduct. He explained that chasing down and shooting the Hispanic males let the rival Norteño gang know the Hanford Gangster Crips were "not to be messed with" and their authority in the area in which the crimes occurred was not to be challenged. Injuring the two little girls let the community know the gang was not going to stop just because there were innocent people in the way, and that the surrounding community was not a concern when the gang was attempting to conduct business. Estrada further opined that the crimes benefited the 600's, in that they were allies of the Hanford Gangster Crips and the crimes demonstrated their militancy. As with the Crips, the crimes showed the community what they were willing to do and sent a message to rivals. The shooters would gain status from shooting a rival. The commission of a major violent crime together would strengthen the bond between the 600's and the Crips.

**II**

**DEFENSE EVIDENCE**

Washington's mother testified that from around 6:00 to at least 8:00 p.m. on April 21, Washington was at their home in Lemoore, playing video games. She denied that Washington was a gang member. To her knowledge, Jacobs, who had stayed with her at times, also was not a gang member.

12.

# DISCUSSION[16]

## I

### SUFFICIENCY OF THE EVIDENCE CLAIMS

Defendants challenge the sufficiency of the evidence with respect to a number of counts and enhancements. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "If the circumstances reasonably justify the [trier of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Instead, reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) This standard of review

---

[16] Each defendant joins in the other's arguments to the extent those arguments benefit him. Each also elaborates on certain arguments made by the other. We are not required to determine which aspects of a claim raised by one defendant might be beneficial to the defendant who did not raise the claim. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363.) As defendants recognize, " 'Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations].' [Citation.]" (*Id.* at p. 364.) With a few exceptions, the claims of error and prejudice made here by each defendant clearly apply equally to both.

applies regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and to both convictions and enhancements (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626).

## A.     **Premeditated Attempted Murder**

### 1.     Attempted murder of Pablo

Defendants challenge the sufficiency of the evidence to sustain their convictions on count 2, the attempted murder of Pablo.  They contend the prosecutor failed to prove the requisite intent to kill Pablo, who, they argue, was not an intended victim.  We conclude the convictions are supported by substantial evidence.

"An attempt to commit a crime occurs when the perpetrator, with the specific intent to commit the crime, performs a direct but ineffectual act towards its commission. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 36.)  Thus, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.)

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime.  [Citation.]  'There is rarely direct evidence of a defendant's intent.  Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.  [Citation.]' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.)  "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill." (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.)

Nevertheless, "[t]he defendant's mental state must be examined as to each alleged attempted murder victim.  Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not

14.

of others." (*People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*).) This is so even though the defendant's conduct may have endangered the lives of more than one person. (See *People v. Perez* (2010) 50 Cal.4th 222, 225, 231.) Because the doctrine of transferred intent does not apply to the crime of attempted murder, "[a] person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill." (*Bland*, *supra*, at p. 317.) Thus, in order to be convicted of multiple counts of attempted murder, each involving a different victim, the prosecution must prove the perpetrator acted with the specific intent to kill each victim. (*People v. Smith*, *supra*, 37 Cal.4th at p. 739.) "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder — due to transferred intent — if the person were killed." (*Bland*, *supra*, at p. 328.)

A person who shoots at a group of people nonetheless may be found guilty of the attempted murder of everyone in the group, even if he or she targeted only one of them, if the person also, concurrently, intended to kill others within what has been termed the " 'kill zone.' " (*Bland*, *supra*, 28 Cal.4th at p. 329.) " 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Ibid*.)

The kill zone theory thus "addresses the question of whether a defendant charged with the murder or attempted murder of an intended target can *also* be convicted of attempting to murder other, nontargeted persons." (*People v. Stone* (2009) 46 Cal.4th 131, 138.) The theory "may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death —

15.

around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm.  Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*People v. Canizales* (2019) 7 Cal.5th 591, 607.)

In the present case, the kill zone theory was not presented to the jury by way of either argument or instruction.  If the theory, as most recently explicated in *Canizales*, was applicable to the evidence presented at trial, the lack of jury instructions and argument likely would not preclude us from considering it in determining whether the evidence was sufficient to sustain defendants' attempted murder convictions with respect to Pablo.  (See *People v. Lindberg* (2008) 45 Cal.4th 1, 32; *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6; *People v. Perez* (1992) 2 Cal.4th 1117, 1126; *People v. Brown* (2017) 11 Cal.App.5th 332, 341.)  We need not decide whether the kill zone theory applies, however, because we conclude the evidence was sufficient to permit jurors reasonably to infer defendants harbored the requisite intent specifically to kill Pablo.

Alejandro told Amador that some people who lived on the block came out and helped him and his companion.  Based on the store video and location of Pablo's residence, jurors reasonably could infer Pablo was one of these individuals.  Jurors also could reasonably infer defendants perceived Pablo as an ally of Alejandro.  Alejandro's group was preparing to fight and may have even been moving toward defendants' group when the shooting took place.  Once Pablo was perceived as joining the fray, he became an intended victim, even if only because he became a momentary obstacle when he jumped or reached in front of Alejandro.  (*People v. Smith*, *supra*, 37 Cal.4th at p. 741; see *People v. Arias* (1996) 13 Cal.4th 92, 162.)

2.      Premeditation and deliberation

Defendants also challenge the sufficiency of the evidence to support the jury's findings of premeditation and deliberation with respect to both attempted murder convictions.  We conclude the findings are supported by substantial evidence.

Premeditated attempted murder carries a significantly greater penalty than attempted murder committed without premeditation and deliberation.  (§ 664, subd. (a).)  To subject a defendant to the greater punishment, the trier of fact must find not only an intent to kill plus a direct but ineffectual act toward the commission of murder, but also that the defendant acted willfully and with deliberation and premeditation.  (*People v. Seel* (2004) 34 Cal.4th 535, 540-541; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207; see *People v. Solomon* (2010) 49 Cal.4th 792, 812.)  The question whether a defendant harbored the requisite state of mind must generally be inferred from the circumstances of the shooting.  (*People v. Ramos*, *supra*, 121 Cal.App.4th at pp. 1207-1208.)

"We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation.  [Citation.]"  (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462-1463, fn. 8, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)  "Willful" simply means "intentional."  (See § 7, subd. (1); *People v. Moon* (2005) 37 Cal.4th 1, 29.)  " '[D]eliberate' " means " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' [Citation.]"  (*People v. Memro* (1995) 11 Cal.4th 786, 862-863.)  "Premeditated" means " ' "considered beforehand." ' "  (*Id*. at p. 863.)  Planning, motive, and manner of killing are pertinent to a determination of whether premeditation and deliberation exist (*People v. Marks* (2003) 31 Cal.4th 197, 230; *People v. Perez*, *supra*, 2 Cal.4th at p. 1125; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27), "but these factors are not exclusive nor are they invariably determinative" (*People v. Marks*, *supra*, 31 Cal.4th

17.

at p. 230; see *People v. Thomas* (1992) 2 Cal.4th 489, 517). "[W]hile premeditation and deliberation must result from ' "careful thought and weighing of considerations" ' [citation], . . . '[t]he process of premeditation and deliberation does not require any extended period of time.' " (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332.) "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' [Citation.]" (*People v. Memro*, *supra*, 11 Cal.4th at p. 863.)

We have set out the evidence in the statement of facts, *ante*, and need not repeat it at length here. Viewed in the light most favorable to the judgment, it shows planning and reflection in that one or both defendants brought a gun when they pursued Alejandro and his companion, and they and their cohorts separated during the chase in an attempt to trap their prey.[17] (See, e.g., *People v. Potts* (2019) 6 Cal.5th 1012, 1027; *People v. Lee* (2011) 51 Cal.4th 620, 636; *People v. Steele* (2002) 27 Cal.4th 1230, 1250; *People v. Ramos*, *supra*, 121 Cal.App.4th at p. 1208; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224; cf. *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270-1271.)

The evidence also shows motive. Gang enmity has long been recognized as evidence of motive for murder, even with respect to someone merely perceived or believed to be a rival gang member or ally of a rival gang. (See, e.g., *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295; *People v. Romero* (2008) 44 Cal.4th 386, 401; *People v. Ramos*, *supra*, 121 Cal.App.4th at p. 1208; *People v. Villegas*, *supra*, 92 Cal.App.4th at p. 1224.) In the present case, in addition to general gang rivalry, there was evidence members of a gang that prided itself on militancy, particularly toward Norteños, felt disrespected and possibly challenged by people they perceived to be

---

**17** Planning need not relate only to the act of killing. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238, fn. 4.)

18.

Norteños. Thus, the fact the victims may have been strangers to defendants does not negate an inference of motive. (See *People v. Solomon*, *supra*, 49 Cal.4th at p. 816; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002.) Finally, Alejandro's description of the manner of shooting — first one shot, then a second shot, then the whole clip — is evidence from which deliberation and reflection can be inferred.

We recognize the shooting took place either during or immediately following an altercation. This does not automatically negate a finding of premeditation and deliberation, however, even assuming Alejandro's companion pulled a knife. (See *People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 295; *People v. Manriquez* (2005) 37 Cal.4th 547, 577; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082.)[18] "[A]ssuming a reasonable jury could have found the evidence did not support premeditation and deliberation . . . , defendants' convictions must stand because . . . '[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.' [Citation.]" (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 295.)

**B.** **Assault with a Firearm and Related Gun Use Enhancements**

1. Assaults of C. and D.

Defendants contend their convictions on counts 3 and 4, assault with a firearm of C. and D., respectively, must be reversed. They contend the evidence was insufficient to prove defendants knew the girls were present behind a nearby fence or harbored an intent to harm either girl. We disagree.

Defendants were convicted of violating section 245, subdivision (a)(2). In pertinent part, the statute requires the commission of an assault, which section 240

---

[18] The jury was instructed on, but rejected, the lesser included offense of attempted voluntary manslaughter based on imperfect self-defense with respect to both attempted murder counts.

defines as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

We are concerned here with the mental state necessary for assault. The California Supreme Court has explained: "The mens rea is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery. Although the defendant must intentionally engage in conduct that will likely produce injurious consequences, the prosecution need not prove a specific intent to inflict a particular harm. [Citation.] The evidence must only demonstrate that the defendant willfully or purposefully attempted a 'violent injury' or 'the least touching,' i.e., 'any wrongful act committed by means of physical force against the person of another.' [Citation.] In other words, '[t]he use of the described force is what counts, not the intent with which same is employed.' [Citation.] Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state. [Citation.]" (*People v. Colantuono* (1994) 7 Cal.4th 206, 214-215.)

In *People v. Williams* (2001) 26 Cal.4th 779, the state high court left its holding in *Colantuono* intact (*People v. Williams*, *supra*, at p. 788), but clarified: "[A] defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (*Id*. at pp. 787-788, fn. omitted.) "[A] defendant who honestly believes that his

20.

act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id*. at p. 788, fn. 3.) The court summarized: "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id*. at p. 790.)

"[A] defendant need not intend to strike any particular person to be guilty of an assault . . . ." (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1737.) "[A]n intent to do an act which will injure any reasonably foreseeable person is a sufficient intent for an assault charge." (*People v. Tran* (1996) 47 Cal.App.4th 253, 262.) Thus, in *People v. Riva* (2003) 112 Cal.App.4th 981, disapproved on another ground in *People v. Anderson* (2020) 9 Cal.5th 946, 956, the court concluded that where the shooting took place in an urban neighborhood consisting of residences and small businesses, at a time of day when people were normally returning from work, school, or shopping, and there were a number of pedestrians and cars in the area when the shooting occurred, "[t]he facts . . . would lead a reasonable person to realize if he fired a gun at someone in a car at this time of day in this kind of neighborhood the bullet could strike a pedestrian and a battery would directly, naturally and probably result from his conduct." (*People v. Riva*, *supra*, at p. 998, fn. omitted.)

In the present case, R.B.'s testimony showed he was holding C. on one side of a fence, and the shots came from the other side of the fence.[19] There were a lot of other people — children and adults — around. J.C. testified that the shots "sounded very close." Another witness testified there was a three-year-old child in the front yard three

---

**19** According to Amador, C. and D. were on the same side of the fence.

houses east of the intersection of Scott and Redington. Alejandro told Amador that when the two groups came together in front of the driveway that led to apartments, he told defendants' group that there were "kids right here" and to have some respect, but Jacobs said he "d[id]n't give a fuck about those kids."

From the foregoing evidence, jurors reasonably could conclude defendants actually knew facts that would lead a reasonable person to realize a battery would directly, naturally, and probably result from the firing of multiple shots toward Alejandro's group. (See *People v. Williams*, *supra*, 26 Cal.4th at pp. 787-788.) This is so regardless of whether C. and/or D. were visible to defendants. (See *People v. Tran*, *supra*, 47 Cal.App.4th at p. 262; compare *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1346 & *People v. Felix* (2009) 172 Cal.App.4th 1618, 1621-1622, 1629-1630 with *People v. Velasquez* (2012) 211 Cal.App.4th 1170, 1176-1177 & *People v. Miller* (2008) 164 Cal.App.4th 653, 664.) Accordingly, defendants are not entitled to reversal of their convictions on counts 3 and 4.

2.      Section 12022.5 enhancements

Defendants challenge the sufficiency of the evidence to sustain the jury's true findings on the firearm enhancements appended to counts 3 and 4. Unlike the firearm enhancement allegations found true with respect to other counts, which, because gang allegations also were found true, required only a finding that a principal in the crime personally used and/or discharged a firearm (§ 12022.53, subd. (e); see *People v. Salas* (2001) 89 Cal.App.4th 1275, 1281), the section 12022.5, subdivision (a) allegations appended to counts 3 and 4 required that the defendant himself must have personally used a firearm. (See, e.g., *In re Antonio R.* (1990) 226 Cal.App.3d 476, 479; *People v. Nguyen* (1988) 204 Cal.App.3d 181, 193.) Defendants argue the evidence showed there was only one firearm used, and there was no evidence more than one person used the firearm; hence, the evidence failed to prove which defendant fired the shot or shots that injured C. and D.

22.

We agree Amador's and Estrada's speculation defendants may have shared one gun was just that — speculation. Speculation is not evidence and is insufficient to sustain a conviction or true finding on an enhancement allegation. (*People v. Waidla* (2000) 22 Cal.4th 690, 735; *People v. Raley* (1992) 2 Cal.4th 870, 891.) Regardless, one eyewitness to the shooting — Alejandro — stated Jacobs fired a chrome pistol, while another eyewitness — Cristian — stated Washington fired a black pistol. Estrada testified that Alejandro and Cristian viewed events from different vantage points, thus explaining how they may have seen different things.

"In reviewing the record on appeal, we must regard all factual disputes in the evidence to have been resolved in favor of the judgment. [Citations.]" (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1217.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Unless the testimony is physically impossible or inherently improbable, the testimony of a single witness is sufficient to establish the identity of the perpetrator or otherwise support a conviction (*People v. Reed* (2018) 4 Cal.5th 989, 1006; *People v. Young*, *supra*, at p. 1181; see Evid. Code, § 411), "even if it is contradicted by other evidence, inconsistent or false as to other portions" (*In re Frederick G.*, *supra*, 96 Cal.App.3d at p. 366). To warrant rejection of a witness's statements on the ground they are inherently incredible "requires ' " 'either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 124.) "The inherently improbable standard addresses the basic content of the testimony itself — i.e., could that have happened? — rather than the apparent credibility of the person testifying." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.)

Here, the jury was not required to accept Alejandro's or Cristian's statements, and reasons existed to question their veracity. But the jury was not required to disbelieve them, either. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1016.) Alejandro's

statement constituted evidence Jacobs fired the shots. That evidence supports the jury's true finding on the firearm use allegation as to Jacobs. Cristian's statement constituted evidence Washington was the one who fired. That evidence supports the jury's true finding on the firearm use allegation as to Washington. (See *People v. Font* (1995) 35 Cal.App.4th 50, 58.)

We recognize that, during deliberations, jurors sent out a note that read: "We believe one Attemted Murde and The OTher aided and abetted. Would Both be charged with Attempted Murder?" (*Sic*.) Assuming this meant jurors determined only one defendant was the shooter, it does not preclude a firearm use finding as to both defendants.[20] "[U]ses," as employed in section 12022.5, subdivision (a), is broadly construed, and does not require that the gun be fired or even pointed at the victim. (*People v. Granado* (1996) 49 Cal.App.4th 317, 322.) If a defendant displays a firearm in order to facilitate the commission of an underlying crime, a "use" has occurred. (*Id*. at p. 325.) "Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*Ibid*.)

Alejandro's and Cristian's statements furnished substantial evidence both defendants used a firearm in commission of the assaults of C. and D., even assuming only one gun was fired. Jurors were not required to decide which defendant actually fired the

---

[20] In some portions of his argument to the jury, the prosecutor described defendants as using "guns" — plural — while in others, he referred to use of "the gun" — singular. "[T]heories suggested by the prosecutor are not the sole theories the jury may consider in making its determination of guilt. [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 947.)

shot or shots that injured C. and D.  (See *People v. Berry* (1993) 17 Cal.App.4th 332, 335-339; see also *People v. Walker* (1988) 47 Cal.3d 605, 635.)

**C.      Shooting at an Occupied Vehicle and Related Gang Enhancements**

Next, defendants challenge the sufficiency of the evidence to sustain their convictions on count 5, shooting at an occupied vehicle in violation of section 246, and the appended gang enhancement.  They say the shooter fired wildly, and there was no evidence either defendant shot at, or intended to hit, any vehicle.  They further contend that even if shots were fired at Alejandro in a gang-related act or to benefit a gang, shots fired wildly or randomly and with no particular purpose were not shown to have benefited any gang or to have been fired with the specific intent required for the gang enhancement, particularly since the incident involving the vehicle was not referenced in the gang expert's testimony.  We disagree with both contentions.

1.       The substantive offense

Section 246 criminalizes the "malicious[] and willful[] discharge [of] a firearm at an . . . occupied motor vehicle . . . ."  "Section 246 is a general intent crime.  [Citation.] As such, the term 'maliciously' in section 246 is defined by section 7, item 4, as 'a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.' "  (*People v. Watie* (2002) 100 Cal.App.4th 866, 879.)  " 'As for all general intent crimes, the question is whether the defendant intended to do the proscribed act.'  [Citation.]  'In other words, it is sufficient for a conviction if the defendant intentionally did that which the law declares to be a crime.'  [Citation.]" (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1356.)

" 'The crime of shooting at an occupied vehicle "is not limited to shooting *directly* at [the] occupied target."  [Citation.]  Rather, the applicable statute "proscribes shooting *either* directly at *or* in close proximity to an . . . occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it." '  [Citation.]" (*People v. Bell* (2019) 7 Cal.5th 70, 109;

25.

see *People v. Overman*, *supra*, 126 Cal.App.4th at pp. 1356-1357.) "Accordingly, one may restate section 246 as prohibiting any person from maliciously and willfully discharging a firearm in the direction of or towards an occupied motor vehicle." (*People v. Manzo* (2012) 53 Cal.4th 880, 885.)

Eric C., whose truck was hit by a bullet, testified that he was "[r]ight on the corner right before Redington" when he heard shots, and he pointed out the location of his truck on a photograph of the intersection of Scott and Redington Streets.[21] He explained that "[t]here was no turning back," so he pushed his youngest son's head down "and punched [his] truck and just tried to get out of there as fast as [he] could."

Based on the evidence, jurors reasonably could have concluded Eric was about to enter the intersection of Scott and Redington Streets when the shooting started, and so could have found the elements of a violation of section 246 proven beyond a reasonable doubt. "Defendant and his associates, engaged in a fusillade of shots directed primarily at persons standing close to a [passing vehicle]. The jury was entitled to conclude that they were aware of the probability that some shots would hit the [vehicle] and that they were consciously indifferent to that result." (*People v. Chavira* (1970) 3 Cal.App.3d 988, 993, fn. omitted.) This is sufficient to satisfy the statutory requirements. (See *People v. Bell*, *supra*, 7 Cal.5th at p. 109.)

2. The gang enhancement

"There are two prongs to the gang enhancement under section 186.22, subdivision (b)(1).[22] [Citation.] The first prong requires that the prosecution prove the underlying felony was 'gang related.' [Citations.] The second prong 'requires that a defendant

---

[21] In addition, video from the store showed Eric's truck as the confrontation between the groups was occurring, and, during the playing of video of the area taken by a drone, Amador showed jurors where the truck was traveling when it was struck.

[22] The gang enhancement appended to count 5 was alleged under subdivision (b)(4) of section 186.22. Although the prescribed punishment differs under the two subparagraphs, the elements of the enhancement remain the same.

commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' [Citation.] [¶] Section 186.22, subdivision (b)(1) provides three alternatives for establishing the first prong . . . . The offense may be committed (1) for the benefit of a gang; (2) at the direction of a gang; or (3) in association with a gang. [Citation.] Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member. [Citations.] The first prong therefore may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were 'on a frolic and detour unrelated to the gang.' [Citations.]" (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484, fn. & italics omitted.)

Here, the evidence showed Washington was a member of the Hanford Gangster Crips, while Jacobs was a member of the 600's. The evidence further showed these gangs were strong allies. From the circumstances surrounding the incident, jurors reasonably could infer defendants came together as gang members, and relied on their gang alliance and the apparatus of their gangs, including the presence of their fellow gang members, in committing the offenses arising out of the shooting, including that involving Eric C.'s occupied vehicle. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60.)[23] Thus, jurors could reasonably have concluded defendants committed a violation of section 246 in association with a gang. Moreover, even without expert testimony on this precise point, jurors reasonably could have concluded the offense benefited both gangs for the same reasons Estrada gave with respect to the assaults on C. and D.

---

[23]    Estrada presented the Hanford Gangster Crips and 600's as separate but allied gangs, not subsets of the same overall gang. (Cf. *People v. Prunty* (2015) 62 Cal.4th 59, 67-68.) *Albillar* involved members of the same gang. (*People v. Albillar, supra*, 51 Cal.4th at p. 51.) In light of the alliance between the Hanford Gangster Crips and the 600's, defendants fail to persuade us this distinction matters. Indeed, they make no attempt to do so.

As for the second prong of the enhancement, there must be substantial evidence defendants acted with "the specific intent to promote, further, or assist in *any* criminal conduct by gang members — including the current offenses . . . ." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 65.) "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id*. at p. 68.) On the evidence presented here, it would be difficult for a rational jury to come to any conclusion other than that defendants harbored the requisite intent.

## D.     Ex-Felon in Possession of a Firearm

Washington contends the evidence was insufficient to sustain his conviction for being an ex-felon in possession of a firearm, as charged in count 7. The elements of a violation of section 29800, subdivision (a)(1) are conviction of a felony and ownership, possession, custody, or control of a firearm. (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 922 [analyzing former § 12021, subd. (a)(1), the predecessor statute to § 29800, subd. (a)(1)].) Washington argues there was nothing more than Estrada's opinion Washington passed the gun off to Jacobs, and the jury was not instructed it must unanimously agree on the identity of the shooter.

As we previously described, there was evidence from which the jury could have concluded Washington personally used a firearm.[24] If believed by the jury, this evidence was sufficient to sustain the conviction. Accordingly, Washington's claim fails.

## II

### EVIDENTIARY CLAIM

Washington contends his prior assault conviction was improperly admitted into evidence as a gang predicate offense. He says the trial court did not recognize it had, and

---

[24]     We will address the lack of unanimity instruction, *post*.

28.

so did not exercise, discretion to exclude the conviction pursuant to Evidence Code section 352. He argues that had the court recognized its discretion, it likely would have excluded the evidence as cumulative, not probative, prejudicial because the prior crimes were somewhat similar to the current offenses, and inflammatory because some of the information was calculated to give the jury a poor impression of Washington's character. We conclude Washington forfeited his claim by failing to object at trial.

## A.      **Background**

Outside the presence of the jury, the court took up the issue of Washington's prior conviction for assault with a firearm (§ 245, subd. (a)(2)), which formed the basis for count 7, ex-felon in possession of a firearm. The court noted that when it read the charges to the jury, it only read that Washington was prohibited from owning or being in possession of a gun as a result of a prior felony. This ensued:

> "[THE COURT:]  I did not know whether you were trying to bifurcate. The issue concerning bifurcation is I would be willing to grant it, but the problem is, it would probably still come in under a predicate act as far as conviction purposes, and that, of course, is a different standard of proof than the proof required for a conviction as a prior.

> "So what is your preference; your trial tactic?

> "[COUNSEL FOR WASHINGTON]:  Well, the charge that my client was in possession of a handgun with a prior felony, that's going to come in to establish one of the elements in that particular count; is that correct?

> "THE COURT:  Well, the way I have done it in the past is that if he admits it then he's admitting one of the elements of that Count 7 and therefore we don't have to go to it; however, the problem is [*sic*] you have the gang enhancements, and with respect to the gang enhancements that's going to be one of the predicate acts used in the matter, and so it's going to come in that way.  [¶] . . . [¶]

> "[COUNSEL FOR WASHINGTON]:  Right.  [¶]  And I think the, what we want to do tactically is admit the prior because they're going to be proven and they're going to be proven in front of the jury. I'd rather have him just admit them and let the deputy move the direction he needs to go.

29.

"THE COURT: Okay. So. [¶] If he admits them with respect to 7, that's an element that's admitted so he would just be already admitting to the jury that he's a prior convicted felon. [¶] . . . [¶] . . . For the possession. That's one element. Then they still have to prove the possession. [¶] . . . [¶] . . . The strike conviction itself would be admitted so they do not have to prove that; however, the special allegations concerning the gang enhancement, basically it still comes in as a predicate act. That's what [the prosecutor] intends to do, and he may make reference to it as a predicate act. [¶] . . . [¶]

"[COUNSEL FOR WASHINGTON]: Can you give me a moment with Mr. Washington?

"THE COURT: I'll give you a moment, but *that's the Court's tentative way to move forward on it. I don't know if you want to object to that or anything else*.

"[PROSECUTOR]: My understanding is I'm, then I'm going to be allowed to talk about this 245 and present evidence about it.

"THE COURT: As . . . to basically prove up the gang allegation.

"[PROSECUTOR]: Under *People versus Tran*.

"THE COURT: Yes, but as far as saying he's got a prior strike and a prior felon [*sic*], that would be precluded." (First italics added.)

The court then gave counsel time to talk to Washington, although it noted that the conviction was "coming in one way or another." Counsel for Washington stated Washington was going to admit the prior conviction. The court then explained the situation to Washington and how the prior conviction could be used. When Washington stated he wished to admit the conviction, the court then advised him, and obtained a waiver, of his rights.

Later, in the jury's presence, the prosecutor presented documents showing, and/or testimony concerning, the convictions and/or juvenile adjudications for gang predicate offenses of five persons aside from Washington, as well as testimony concerning their gang affiliations. Two were Hanford Gangster Crips, while three (one of whom was Cristian M.) were 600's or West Side Mafia, a former name of the 600 gang.

The prosecutor also proffered exhibits 95, 95-A, and 95-B. Exhibit 95 was a first amended information filed October 22, 2015, which charged Washington with carjacking (§ 215, subd. (a); count 1), robbery (§ 211; count 2), and assault with a firearm (§ 245, subd. (a)(2); count 3). Exhibit 95-A was a minute order from October 22, 2015, reflecting that an agreement was reached whereby Washington pled guilty to count 3 and the other counts were dismissed. Exhibit 95-B was a minute order from November 19, 2015, which showed Washington was placed on probation for five years on various terms and conditions. Asked by the court if he had any objection, counsel for Washington responded, "No objection," and the exhibits were admitted into evidence.

**B.     Analysis**

" 'To establish that a group is a criminal street gang within the meaning of [section 186.22], the People must prove:  (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity.'  [Citation.]  'A "pattern of criminal gang activity" is defined as gang members' individual or collective "commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" enumerated "predicate offenses" during a statutorily defined time period.  [Citations.]  The predicate offenses must have been committed on separate occasions, or by two or more persons.  [Citations.]' "  (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 581.)  A charged crime may serve as a predicate offense (*ibid.*), as may an offense the defendant committed on a separate occasion (*People v. Tran* (2011) 51 Cal.4th 1040, 1044).

Upon timely objection, an offense the defendant committed on a separate occasion may be subject to exclusion pursuant to Evidence Code section 352.[25]  The mere fact the prosecution might be able to develop predicate offenses committed by other gang members does not, however, automatically require exclusion of evidence of the defendant's own offense to show a pattern of gang activity.  (*People v. Tran*, *supra*, 51 Cal.4th at pp. 1048-1049.)

In the present case, Washington made no objection to admission of the evidence, despite being given several opportunities to do so.  "A defendant 'ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed himself or herself of the opportunity to bring them to that court's attention.'  [Citation.]  Generally, a timely objection is required for reversal of a judgment on the merits of an alleged erroneous admission of the evidence.  (Evid. Code, § 353, subd. (a).)"  (*People v. Stevens* (2015) 62 Cal.4th 325, 334; see, e.g., *People v. Landry* (2016) 2 Cal.5th 52, 86.)  Thus, "[a] defendant who fails to make a timely objection or motion to strike evidence may not later claim that the admission of the evidence was error . . . ."  (*People v. Abel* (2012) 53 Cal.4th 891, 924.)  When an objection is made, the specific ground of the objection must be stated.  (*Ibid*.)  " 'What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling."  (*Ibid*.)

We see no reason the requirement of a timely and specific objection should be excused in the present case.  The trial court's comments do not suggest any objection on

---

[25]   Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

the grounds of Evidence Code section 352 would have been futile. This is particularly true with regard to the inclusion in the exhibits of the carjacking and robbery counts that were dismissed.

Washington points to the fact the court and prosecutor recognized *People v. Tran*, *supra*, 51 Cal.4th 1040, as controlling authority, but ignored the discussion in that case of Evidence Code section 352. He claims that in light of this acknowledgement of *Tran*, the scope of the objection was readily inferable and so no formal statement was required in order to preserve the issue for review. (See *People v. Lang* (1989) 49 Cal.3d 991, 1010, abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) He also suggests the trial court anticipated a defense objection and "headed it off."

We are not persuaded. The reporter's transcript shows the trial court was scrupulous about placing its Evidence Code section 352 weighing process on the record whenever an objection under that statute was made. That it did not do so here shows it did not infer such an issue was being raised. If Washington wished to have the trial court exercise its discretion by weighing probative value against prejudicial effect, he should have made his objection clear.

"For the first time in his reply brief, [Washington argues that any forfeiture of his claim] was ineffective assistance of counsel. It is rarely appropriate to resolve an ineffective assistance claim on direct appeal [citation]; we certainly will not do so where, as here, the claim is omitted from the opening brief and thus waived [citations]." (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)[26]

---

[26] "Failure to object rarely constitutes constitutionally ineffective legal representation . . . ." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) Were we to reach the merits of a challenge to admission of Washington's prior conviction or of his claim of ineffective assistance of counsel, we would find no cause for reversal. The prosecutor was seeking to prove the existence of two gangs — the Hanford Gangster Crips and the 600's. Thus, he had to meet the requirements of section 186.22, subdivisions (e) and (f) for each gang. Although conviction of only two predicate offenses was required per gang, the prosecutor was additionally required to prove each was an ongoing association of three or

## JURY INSTRUCTION CLAIMS

### A.    Failure to Instruct on Lesser Included Offenses

Defendants contend the trial court erred by failing to instruct on unpremeditated attempted murder as a lesser included offense of premeditated attempted murder as to counts 1 and 2, and on grossly negligent discharge of a firearm as a lesser included offense of shooting at an occupied motor vehicle as to count 5.  We find no cause for reversal.

### 1.    General legal principles

" 'In criminal cases, even absent a request, a trial court must instruct on the general principles of law relevant to the issues the evidence raises.  [Citation.]  " 'That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.  [Citations.]' "  [Citation.]  "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is

---

more persons.  In this regard, Washington constituted the third member of the Hanford Gangster Crips.  Had the trial court been presented with the issue, it would have been well within its discretion to find, under the circumstances, the evidence was not cumulative.  The prosecutor was not required to rely solely on Estrada's estimates of the membership numbers of the two gangs, thereby running the risk jurors would question the basis for Estrada's testimony in that regard.  Additionally, any risk jurors would consider the evidence for the improper purpose of demonstrating Washington's bad character was minimized by the trial court's instruction that jurors could not conclude, from evidence of gang activity, that a defendant was a bad person or had a disposition to commit crimes, and from the prosecutor's statement, during his opening summation, that he was not mentioning the evidence to say Washington was a bad person, but rather because the conviction was for one of the primary activities of a gang and Washington was a gang member, both of which the jury could use to establish the existence of the gang.

'substantial enough to merit consideration' by the jury.  [Citations.]" ' [Citations.]  In this regard, the testimony of a single witness . . . may suffice to require lesser included offense instructions.  [Citation.]  Courts must assess sufficiency of the evidence without evaluating the credibility of witnesses, for that is a task reserved for the jury.  [Citation.]  The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.'  [Citations.]"  (*People v. Wyatt* (2012) 55 Cal.4th 694, 698; see, e.g., *People v. Breverman* (1998) 19 Cal.4th 142, 162, 178.)[27]

An appellate court "independently review[s] a trial court's failure to instruct on a lesser included offense.  [Citation.]"  (*People v. Cook* (2006) 39 Cal.4th 566, 596; accord, *People v. Waidla*, *supra*, 22 Cal.4th at p. 733.)  "For purposes of determining a trial court's instructional duties, . . . 'a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.  [Citations.]' [Citations.]"  (*People v. Smith* (2013) 57 Cal.4th 232, 240.)

     2.      <u>Attempted murder</u>

Defendants contend the trial court committed prejudicial error, with respect to counts 1 and 2, by failing to instruct on unpremeditated attempted murder as a lesser included offense of premeditated attempted murder.  In response, the Attorney General says nonpremeditated attempted murder is not a lesser included offense of premeditated attempted murder; rather, the portion of section 664, subdivision (a) that imposes greater punishment for attempted murder that is premeditated constitutes a penalty provision.

---

[27]    An exception to this standard of prejudice may exist when the error deprives a defendant of his or her federal constitutional right to present a complete defense.  (*People v. Rogers* (2006) 39 Cal.4th 826, 868, fn. 16; but see *People v. Molano* (2019) 7 Cal.5th 620, 672.)

(See, e.g., *People v. Favor* (2012) 54 Cal.4th 868, 876-877, 879; *People v. Bright* (1996) 12 Cal.4th 652, 660-661, 665-668, overruled in part in *People v. Seel*, *supra*, 34 Cal.4th at p. 550 & fn. 6; *People v. Douglas* (1990) 220 Cal.App.3d 544, 549-550.) Defendants acknowledge these authorities, but dispute their continuing validity following *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, in which the United States Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (See *People v. Banks* (2014) 59 Cal.4th 1113, 1152 [willful, deliberate, and premeditated nature of attempted murder is functional equivalent of element of offense], overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; *People v. Seel*, *supra*, 34 Cal.4th at p. 541 [under *Apprendi*, § 664, subd. (a), although designated a penalty provision, effectively placed the defendant in jeopardy for offense greater than attempted murder].)

We need not become embroiled in this dispute. The trial court instructed the jury, in pertinent part:

> "The defendants are charged in Counts 1 and 2 with attempted murder. To prove that a defendant is guilty of attempted murder, the People must prove that, one, the defendant took at least one direct but ineffective step toward killing another person; and two, the defendant intended to kill that person. [¶] . . . [¶]

> "*If you find the defendants guilty of attempted murder* under Counts 1 and 2, *you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation*. The defendants acted willfully if they intended to kill when they acted.

> "The defendants deliberated if they carefully weighed the considerations for or against their choice, and knowing the consequences, decided to kill.

> "The defendants acted with premeditation if they decided to kill before completing the acts of attempted murder . . . . [¶] . . . [¶]

36.

*"The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved*." (Italics added.)

It is clear from the foregoing that the trial court adequately instructed on unpremeditated attempted murder. Moreover, the verdicts show the jury made separate and express findings on attempted murder and the allegation of premeditation and deliberation as to each count and each defendant. Defendants fail to explain what they would have gained had the trial court expressly designated unpremeditated attempted murder as a lesser offense of premeditated attempted murder.

Where warranted by the evidence, "the jury must be allowed to 'consider the *full range* of possible verdicts . . . ,' so as to '*ensure* that the verdict is no harsher or more lenient than the evidence merits.' [Citations.]" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 160.) To force the jury to make an " 'all or nothing' choice between conviction of the crime charged or complete acquittal" denies the jury the opportunity to decide whether the defendant is guilty of an intermediate offense established by the evidence. (*People v. Barton* (1995) 12 Cal.4th 186, 196.)

Here, the jury was not forced to make an unwarranted all-or-nothing choice between unpremeditated and premeditated attempted murder. They were given a full opportunity to resolve the factual question and return an intermediate verdict. (Cf. *People v. Ramkeesoon* (1985) 39 Cal.3d 346, 352.)

3.      Shooting at an occupied motor vehicle

Defendants were convicted, in count 5, of shooting at an occupied vehicle in violation of section 246. The trial court did not instruct on grossly negligent discharge of a firearm, in violation of section 246.3, subdivision (a)(1), as a lesser included offense. Defendants now contend their convictions on count 5 must be reversed as a result. We disagree.

A violation of section 246.3, subdivision (a) is necessarily included in a violation of section 246. (*People v. Ramirez* (2009) 45 Cal.4th 980, 983, 990; *People v. Overman*,

37.

*supra*, 126 Cal.App.4th at p. 1361.)  The elements of section 246.3, subdivision (a) are:
" '(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person.'  [Citations.]" (*People v. Ramirez, supra*, at p. 986.) " 'Gross negligence, as a basis for criminal liability, requires a showing that the defendant's act was " 'such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' " [Citation.]" (*Id*. at p. 989.)

Section 246 and section 246.3, subdivision (a) "[b]oth . . . require that the defendant willfully fire a gun.  Although the mens rea requirements are somewhat differently described, both are general intent crimes.  The high probability of human death or personal injury in section 246 is similar to, although greater than, the formulation of likelihood in section 246.3[, subdivision ](a), which requires that injury or death 'could result.'  The only other difference between the two, and the basis for the more serious treatment of a section 246 offense, is that *the greater offense requires that an inhabited dwelling or other specified object be within the defendant's firing range*." (*People v. Ramirez, supra*, 45 Cal.4th at p. 990, italics added; see *People v. Overman*, *supra*, 126 Cal.App.4th at p. 1362.)

In *People v. Bell, supra*, 7 Cal.5th 70, the defendant was charged, inter alia, with violating section 246.  On appeal, he claimed the trial court erred by failing to instruct on section 246.3, subdivision (a) as a lesser included offense.  (*People v. Bell, supra*, at p. 108.)  The California Supreme Court disagreed, finding no substantial evidence the defendant committed only the lesser offense.  (*Id*. at p. 110.)  The court observed that "to find defendant guilty of section 246.3, subdivision (a) but not section 246, the jury would have had to find that defendant's shots were not aimed at or ' "in close proximity to" ' [the victim's] truck."  (*Id*. at p. 109.)  The victim testified that he saw someone emerge

38.

from a convenience store that had just been robbed.  The shooter was running toward the victim's truck, and the victim heard two shots.  He later found a dent in his passenger door.  He thought the shots were directed at him, but never saw the shooter aim at his truck.  Another witness testified he saw the defendant shooting at the victim, and that the defendant later said he shot at the victim to eliminate witnesses.  (*Id.* at p. 109.)  The state Supreme Court concluded that even if, as the defendant argued, the jury could have disregarded the nonvictim witness's testimony because of credibility problems, "the record includes no evidence that defendant fired aimlessly or into the air.  ' "Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense." ' [Citation.]  There was no substantial evidence that defendant was guilty only of a grossly negligent firearm discharge.  The court had no sua sponte duty to instruct on this lesser offense.  [Citation.]" (*Id.* at pp. 109-110.)

In *People v. Overman*, *supra*, 126 Cal.App.4th 1344, there was evidence that moments before the defendant fired his rifle, he pointed it at two men who were standing in close proximity to an occupied building.  The appellate court concluded the jury reasonably could have inferred the defendant fired his rifle directly at or in close proximity to an occupied building under circumstances showing a conscious disregard for the probability one or more bullets would hit the building or persons in or around it; hence, substantial evidence supported the giving of an instruction on section 246. (*People v. Overman*, *supra*, at p. 1362.)  The court also found there was evidence the defendant violated section 246.3 and not section 246, however.  No witnesses saw where the defendant was pointing his rifle at the time he fired; the defendant was an excellent marksman and there was evidence concerning the trajectory of bullets fired from his type of rifle, suggesting he would have hit whatever he aimed at; and no bullet holes or points of impact were found on the building.  Because jurors could have found the defendant fired his rifle under circumstances showing a grossly negligent disregard for human life in that he fired in the general vicinity of several persons, while also finding he did not fire

39.

directly at or in close proximity to an occupied building, the court concluded, the trial court erred in failing to instruct on a violation of section 246.3, subdivision (a) as a lesser included offense. (*People v. Overman*, *supra*, at pp. 1362-1363.)

We have summarized the pertinent evidence, *ante*. Only speculation would permit a conclusion defendants did not fire in close proximity to Eric C.'s occupied vehicle. Accordingly, the trial court was not required to instruct, sua sponte, on section 246.3, subdivision (a) with respect to count 5.

## B.     Failure to Give Unanimity Instruction

Jurors were instructed that a person could be found guilty of a crime either because he or she directly committed the crime, or because he or she aided and abetted a perpetrator who directly committed the crime. Jurors were also instructed that the People had the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime, and that their verdict must be unanimous. Jurors were not given CALCRIM No. 3500 or a similar instruction, however.[28]

Defendants now contend their convictions on counts 1 through 5 must be reversed because the trial court failed to instruct jurors they must unanimously agree on the identity of the shooter. They say such an instruction was required because the prosecutor failed to elect a specific theory on which to prove the charges. They further assert a factual issue — which witness to believe, and which factual scenario to accept — was in question, and not merely a theory of liability. We reject defendants' arguments and find no error.

---

[28]     CALCRIM No. 3500 provides: "The defendant is charged with ___ <*insert description of alleged offense*> [in Count ___] [sometime during the period of ___ to ___]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

A jury verdict in a criminal case must be unanimous. (*Ramos v. Louisiana* (2020) 590 U.S. ___, ___ [140 S.Ct. 1390, 1397]; *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) As noted, the court here so instructed the jury.

> "Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]

> "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] . . . 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.]

> "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.]" (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.)

We review the trial court's decision whether to give a unanimity instruction de novo. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.) Even absent a request, a trial court should give a unanimity instruction " 'where the circumstances of the case so dictate.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.) "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her [or him] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or

acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo*, *supra*, 25 Cal.4th at pp. 1134-1135.)

"[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of [the charged offense] as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. [Citations.] This rule of state law passes federal constitutional muster." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918-919, citing *Schad v. Arizona* (1991) 501 U.S. 624; accord, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 801-802; *People v. Russo*, *supra*, 25 Cal.4th at p. 1133; *People v. Majors* (1998) 18 Cal.4th 385, 408.)

Defendants' claim juror unanimity was required with respect to the identity of the shooter is, at its foundation, a claim jurors had to agree unanimously on which defendant (if not both) was the direct perpetrator and which one was the aider and abettor. Clearly, such unanimity was not required. The prosecutor was not obligated to elect the specific theory on which to prove the charges, and the trial court was not required to instruct jurors they must unanimously agree on a theory.

Defendants' attempts to cast their claims as something different are not persuasive. Jacobs says the theories of liability were inconsistent and conflicting. Washington agrees, and expounds on the contention by asserting there was evidence from which the jury could have found he was guilty "of *one offense*, personally firing at the victims, but

42.

not the *other offense*, which was assisting Jacobs, who personally fired the gun.  And vice versa."  (Italics added.)

The basis for defendants' apparent belief that different forms of criminal liability — direct perpetrator versus aider and abettor — give rise to separate *offenses* escapes us. We are aware of no authority for such a proposition in California law.  That the evidence may have presented competing factual scenarios and determinations of witness credibility neither changes this nor means a unanimity instruction was required.

"The Legislature has determined those who aid and abet and those who actually perpetrate the offense are principals and equally culpable.  (§ 31.)  Clearly, criminal law is ultimately concerned with ascribing criminal responsibility for discrete events.  This is done by defining crimes . . . and by determining who will be responsible for those crimes, for example, aider and abettors and direct perpetrators.  Once the discrete event is identified, for example, the killing of a particular human being, the theory each individual juror uses to conclude the defendant is criminally responsible need not be the same and, indeed, may be contradictory."  (*People v. Davis* (1992) 8 Cal.App.4th 28, 45.)  Thus, "[n]ot only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt.  Sometimes, as [may have] occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what.  There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."  (*People v. Santamaria*, *supra*, 8 Cal.4th at p. 919.)[29]  "Here, the jury need not have unanimously agreed on which accomplice personally [fired the shots] and which aided or abetted the [resulting crimes]. [Citation.]"  (*People v. Gomez* (2018) 6 Cal.5th 243, 279.)

---

[29]    The jury's note, which we mentioned *ante*, suggests jurors did indeed agree who was the direct perpetrator and who was the aider and abettor.

## IV

### SENTENCING CLAIMS

Defendants challenge portions of their sentences on several grounds. We address each in turn.

### A.     The Sentences

#### 1.     Washington

The probation officer's report, which was completed and filed January 2, 2018, listed a birthdate for Washington that made him 19 years old when the offenses were committed. His prior criminal record consisted of convictions for driving without a license (Veh. Code, § 12500, subd. (a)) and assault with a firearm (§ 245, subd. (a)(2)), for the latter of which he was on probation at the time of his arrest in the present case.

The total recommended sentence was 27 years 4 months plus 165 years to life in prison. In pertinent part, the probation officer observed that the section 12022.53, subdivision (d) enhancements subjected Washington to an additional term of 25 years to life on each count as to which they were found true and that, pursuant to section 12022.53, subdivision (f), the court "shall" impose the enhancement carrying the greatest term. The officer recommended imposition of the section 12022.53, subdivision (d) enhancement on counts 1, 2, and 5, and that the enhancements found true under subdivisions (b) and (c) of section 12022.53 be stayed. The probation officer noted Washington had been found to have suffered a prior serious felony conviction pursuant to section 667, subdivision (a)(1), and so he was subject to imposition of a consecutive term of five years on counts 1 through 7; however, it was recommended the enhancement be imposed only on count 1 and stayed as to the remaining counts.

With respect to Washington's financial status, the probation officer's report related that although Washington had never been employed, he was youthful and in good health, with the ability to obtain employment in state prison. Accordingly, the probation officer recommended Washington be held accountable to pay all fines and fees as

44.

prescribed by the court, including a $10,000 restitution fine pursuant to section 1202.4, subdivision (b).

Sentence was imposed on January 9, 2018.  This took place:

"[THE COURT:]  . . . [T]his Court heard the trial testimony in this was basically that the defendant used a firearm in, I'll say, protecting his turf by chasing down one suspect, being confronted by one victim, being confronted by another victim, shooting at the victim and then running away.

"Unfortunately, these shots did not just go toward the victim but there were also two innocent children that were in their own yards, if you will, or within the confines of their own housing area that also got hit, and but for the grace of God could have been dead.

"One, of course, will always bare [*sic*] a scar across her chest where she got hit.  The other one will probably have minor scars that will heal with time.  The mere fact is that they were innocent children, and the violence that the gangs perpetrate on society, society stays [*sic*] deal with them.

"And the evidence that was presented was straight forward and the counts in this matter were basically very straight forward counts; two attempted murders for two victims, two assault with deadly weapons for two other minor victims, and then I should also state that there was another victim in that he was just driving through the area with his children in his vehicle also got hit.

"And then, of course, being a felon in possession.  The Court is inclined to follow the recommendations of the probation department in this matter.  At this point in time, I will listen to arguments . . . ."

Washington's attorney observed that Washington was 20 years old and had a minimum criminal record, and that his record doubled his sentence.  Counsel asked the court, based on these facts, to impose the mitigated terms on counts 3, 4, 6, and 7, and as to the firearm enhancements on counts 3 and 4.  The prosecutor asked the court to adopt its indicated sentence.  This ensued:

"THE COURT:  The Court has considered this matter.  I am cognizant of the defendant being 20 years of age.

45.

"I'm cognizant of his and aware of his probation violation case as well because I'm the one that put him on probation finding unusual circumstances due to his age at the time I put him on probation.

"Now, at this point in time there are five victims that I must, that society needs to, five victims in this matter and society needs to impose punishment. There are separate victims and therefore that is one of the reasons for the consecutive sentencing.

"I did consider the fact that Counts 1 and 2, I should run concurrent given the age and the lack of criminal record. There's no way that I could ever consider running 3 and 4 concurrent because each individual victim needs some sort of relief from the Court by imposing punishment. [¶] . . . [¶]

"[COUNSEL FOR WASHINGTON]: Your Honor, for the record, I also considered that as part of my argument; however, I did some research and I'm not sure that legally they can be run concurrent because of the strike prior, so that is why I did not argue that point.

"THE COURT: Accepted. I took more than a few hours to consider how I would do the sentence in the matter, and while it's not impossible for me to do, I understand it's within my discretion and the findings that I would have to make in order to do that. [¶] . . . [¶]

"Count 5 is another individual victim in the matter that deserves some sort of retribution in the matter and then, of course, Count 6 is the gang which I will stay as recommended."

The court then proceeded to impose sentence as follows:

*Count 1*: The court imposed a term of 30 years to life for premeditated attempted murder with the gang enhancement, plus 25 years to life pursuant to section 12022.53, subdivision (d) enhancement, plus five years for the section 667, subdivision (a) enhancement.[30] It also imposed 10- and 20-year enhancements pursuant to section 12022.53, subdivisions (b) and (c), respectively, but stayed them pursuant to section 12022.53, subdivision (f).

---

[30] Although not expressly stated, it is apparent the 30-year portion of the sentence imposed in counts 1, 2, and 5 was derived from the minimum parole eligibility date specified in section 186.22, subdivision (b)(4) and (5), doubled for the strike.

*Count 2*:  The court imposed the same sentence as for count 1, except the section 667, subdivision (a) enhancement was stayed.

*Count 3*:  The court imposed the upper term of four years, doubled to eight years by the strike, for the violation of section 245, subdivision (a)(2), plus it chose the upper term of 10 years for the section 12022.5, subdivision (a) enhancement, and it imposed but stayed a 10-year term for the gang enhancement and the five-year term for the prior conviction.  The court explained that it chose the upper terms because, based on the evidence it heard at trial, it found Washington's actions "egregious."

*Count 4*:  Because it chose to impose a consecutive sentence on this count, the court opted for the middle term of three years, doubled to six years by the strike.  It imposed a consecutive term of one year four months (one-third of the middle term of four years) for the firearm enhancement, and imposed but stayed a 10-year term for the gang enhancement and the five-year term for the prior conviction.

*Count 5*:  The court imposed a term of 30 years to life for shooting at an occupied vehicle plus the gang enhancement, plus 25 years to life for the section 12022.53, subdivision (d) enhancement.  It imposed but stayed enhancements pursuant to section 12022.53, subdivisions (b) and (c), and section 667, subdivision (a).

*Count 6*:  The court imposed the middle term of five years, then stayed it pursuant to section 654.  It also imposed but stayed the five-year enhancement for the prior conviction.

*Count 7*:  The court imposed the middle term of four years, which it noted would be one year four months if run consecutively, but stayed the sentence pursuant to section 654.

The total term imposed was 27 years 4 months plus 165 years to life.[31]

---

[31]    This included a consecutive term of one year (one-third the middle term) in the probation violation case.

47.

With respect to financial obligations, the court ordered Washington to pay a $10,000 restitution fine pursuant to section 1202.4, subdivision (b). It imposed but stayed a parole revocation restitution fine (§ 1202.45) in the same amount. It also ordered Washington to pay a court operations assessment (§ 1465.8) in the amount of $280, and a court facilities funding assessment (Gov. Code, § 70373, subd. (a)(1)) in the amount of $210. Restitution to the victims was reserved.[32]

### 2.　Jacobs

The probation officer's report, which was completed and filed January 2, 2018, listed a birthdate for Jacobs that made him 18 years old when the offenses were committed. His prior criminal record consisted of a conviction for drunk driving (Veh. Code, § 23153, subd. (e)), and he had three referrals to the probation department as a juvenile for misdemeanor violations of the Penal Code that were handled informally.

The total recommended sentence was 16 years 4 months plus 120 years to life in prison. In pertinent part, the probation officer observed that the section 12022.53, subdivision (d) enhancements subjected Jacobs to an additional term of 25 years to life on each count as to which they were found true and that, pursuant to section 12022.53, subdivision (f), the court "shall" impose the enhancement carrying the greatest term. The officer recommended imposition of the section 12022.53, subdivision (d) enhancement on counts 1, 2, and 5, and that the enhancements found true under subdivisions (b) and (c) of section 12022.53 be stayed.

With respect to Jacobs' financial status, the probation officer's report related that Jacobs was youthful and in good health, with the ability to obtain employment in state prison. Accordingly, the probation officer recommended Washington be held

---

[32] The court also reiterated the financial obligations previously ordered in the probation case, i.e., a $300 restitution fine, $40 court operations assessment, and $30 court facilities funding assessment. It also ordered payment of the previously stayed fine pursuant to section 1202.44.

accountable to pay all fines and fees as prescribed by the court, including a $10,000 restitution fine pursuant to section 1202.4, subdivision (b).

Jacobs was sentenced immediately after Washington. After recounting the circumstances of the case and making comments similar to those it made at the outset of Washington's sentencing hearing, the court observed:

> "The Court — well, society requires that retribution be sought with respect to its victims. The Court can think of — the mere fact that gangs are involved, people somehow think that they're disrespected because other people walk through their quote 'turf' or 'territory' is ridiculous and cowardice.

> "And then to shoot weapons in an area that is just where there are numerous people, again, just shows how ridiculous the situation, how dangerous gangs have become in this matter.

> "This defendant is 19, 20 years of age. He has no criminal record whatsoever. However, his involvement in this crime belies his age."

The court then stated it intended to follow the recommendation of the probation department, but it invited counsel to comment. Counsel for Jacobs asked the court to consider Jacobs's age and, where applicable, to minimize the sentence and make it concurrent. The prosecutor submitted the matter.

The court then proceeded to impose sentence as follows:

*Count 1*: The court imposed a term of 15 years to life for the premeditated attempted murder with the gang enhancement, plus 25 years to life pursuant to section 12022.53, subdivision (d) enhancement. It also imposed 10- and 20-year enhancements pursuant to section 12022.53, subdivisions (b) and (c), respectively, but stayed them pursuant to section 12022.53, subdivision (f).

*Count 2*: The court imposed the same sentence as for count 1.

*Count 3*: The court imposed the upper term of four years for the offense, plus the upper term of 10 years for the firearm enhancement. It elected the upper term "due to the egregious nature of the conduct." It imposed but stayed a 10-year gang enhancement.

*Count 4*:  Because it chose to impose a consecutive sentence on this count, the court opted for the middle term of three years for the offense, as well as the middle term of four years for the firearm enhancement.  It imposed but stayed a 10-year term for the gang enhancement.

*Count 5*:  The court imposed a term of 15 years to life for shooting at an occupied vehicle plus the gang enhancement, plus 25 years to life for the section 12022.53, subdivision (d) enhancement.  It imposed but stayed enhancements pursuant to section 12022.53, subdivisions (b) and (c).

*Count 6*:  The court imposed the middle term of two years, one-third of which was eight months, then stayed it pursuant to section 654.

The total term imposed was 16 years 4 months plus 120 years to life.

With respect to financial obligations, the court ordered Jacobs to pay a $10,000 restitution fine pursuant to section 1202.4, subdivision (b).  It imposed but stayed a parole revocation restitution fine (§ 1202.45) in the same amount.  It also ordered Jacobs to pay a court operations assessment (§ 1465.8) in the amount of $280, and a court facilities funding assessment (Gov. Code, § 70373, subd. (a)(1)) in the amount of $210.  Restitution to the victims was reserved.

**B.  The Section 667, Subdivision (a) Enhancement**

At the time Washington was sentenced, trial courts lacked discretion to strike or dismiss a five-year serious felony enhancement.  (§§ 667, former subd. (a)(1), 1385, former subd. (b).)  This bar was removed by Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1013, §§ 1-2), which went into effect on January 1, 2019.

Washington contends the amendments apply retroactively to him because his convictions are not yet final, and the matter must be remanded so the trial court can consider whether to strike the enhancements.  (See *In re Estrada* (1965) 63 Cal.2d 740, 744; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.)  The Attorney General agrees, as

do we.  The trial court exercised some leniency in its sentencing choices.  Based on its statements and sentencing decisions, we cannot say a remand would be futile.[33]

## C.        The Firearm Enhancements

One day before the probation officer's report was filed and eight days before sentencing, Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1-2) (Senate Bill No. 620) went into effect.  It amended sections 12022.5, subdivision (c) and 12022.53, subdivision (h) so as to afford trial courts discretion to strike or dismiss, in the interest of justice pursuant to section 1385, firearm enhancements under either statute.[34] Defendants say they are entitled to a remand to permit the trial court to exercise its discretion, because it sentenced them without knowledge of its discretionary authority.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.  [Citations.]  A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.'  [Citation.]  In such circumstances, [the California Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'  [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

---

**33**      We express no opinion as to how the trial court should exercise its discretion.  If, after remand, there is no change in sentence with respect to the section 667, subdivision (a) enhancements, the abstract of judgment must be corrected to reflect those enhancements were imposed but stayed with respect to counts 2 and 5.  (See *People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

**34**      Prior to the effective date of Senate Bill No. 620, section 12022.5, former subdivision (c) and section 12022.53, former subdivision (h) precluded the striking of an allegation or finding under the applicable statute notwithstanding section 1385 or any other provision of law.

However, " '[p]erhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error.' [Citation.] ' "We must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate error — it will not be presumed. [Citation.]" [Citations.]' [Citation.] . . . [T]he defendant further bears the burden to provide a record on appeal which affirmatively shows that there was an error below, and any uncertainty in the record must be resolved against the defendant. [Citations.]" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549; see *People v. Giordano* (2007) 42 Cal.4th 644, 666.) Moreover, " '[i]t is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties. [Citations.]' [Citation.]" (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.) "These general rules concerning the presumption of regularity of judicial exercises of discretion apply to sentencing issues. [Citations.]" (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496-497.) "From a silent record, we cannot determine the sentencing court misunderstood its authority or discretion." (*People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1523.)

The Attorney General contends the record here is silent; hence, we must presume the trial court was aware of its eight-days-old discretion under Senate Bill No. 620. Defendants point to the newness of the amendment to sections 12022.5, subdivision (c) and 12022.53, subdivision (h), as well as the facts neither the probation officer's report nor the parties mentioned the new law, and the court indicated no awareness of it despite mentioning a change in the law concerning disposal of registered firearms for convicted felons.

We agree with defendants. It is apparent from the portions of the probation reports titled "**RULE 4.428 – CRITERIA AFFECTING IMPOSITION OF ENHANCEMENTS**" and "**RULE 4.447 – LIMITATIONS ON ENHANCEMENTS**"

52.

that the probation officer was unaware of the change in the law. The trial court relied on the probation officer's analyses, conclusions, and recommendations. In light of the court's discussion of its discretion regarding other aspects of sentencing, its failure to mention its new discretion concerning the firearm enhancements, coupled with the probation officer's lack of awareness of same, convince us the presumption has been overcome and remand is warranted.[35]

Defendants further argue that upon remand, the trial court can consider imposing enhancements on counts 1, 2, and 5 pursuant to subdivision (b) or (c) of section 12022.53, instead of the 25-years-to-life term mandated under subdivision (d) of the statute, if the court declines to strike the enhancements altogether. We agree.

Where, as here, a defendant has been found to have personally used a firearm in the commission of an offense enumerated in subdivision (a) of section 12022.53, the statute sets out three different sentence enhancements that depend upon the nature and consequences of the firearm use. Subdivision (b) specifies a 10-year enhancement for the personal use of a firearm. Subdivision (c) specifies a 20-year enhancement for the personal and intentional discharge of a firearm. Subdivision (d) specifies an enhancement of 25 years to life for the personal and intentional discharge of a firearm that proximately causes great bodily injury or death. Subdivision (f) of section 12022.53 precludes imposition of more than one term of imprisonment under the statute per person

---

[35] We recognize the trial court had the choice of imposing a consecutive enhancement of three, four, or 10 years with respect to the firearm enhancements appended to counts 3 and 4. (§ 12022.5, subd. (a).) It chose the upper term for the enhancement with respect to count 3, despite the fact counsel for both defendants argued for a lesser term, and it appears to have chosen the middle term for the enhancement with respect to count 4 only because it was statutorily required to do so once it chose to impose a consecutive term on that count. (See §§ 1170.1, subd. (a), 1170.11.) Because the trial court was unaware of the scope of its discretion and the matter is being remanded with respect to the section 12022.53 enhancements, we find it appropriate to include the section 12022.5 enhancements in our remand order. Again, we express no opinion as to how the trial court should exercise its discretion.

for each crime, and states that "[i]f more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment."

In *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), the Court of Appeal held that an *uncharged* enhancement under section 12022.53, subdivision (b) or (c) can be imposed in lieu of an enhancement under subdivision (d) of the statute, if the subdivision (d) enhancement was unsupported by substantial evidence, was defective or legally inapplicable in some other respect, or if the trial court struck the subdivision (d) enhancement pursuant to section 1385. (*Morrison*, *supra*, at pp. 222-223.) The appellate court remanded the matter, because at the time the trial court recalled the defendant's sentence in light of newly enacted Senate Bill No. 620, no published case had held that an uncharged lesser enhancement could be imposed in place of an enhancement under section 12022.53, subdivision (d), in connection with striking the greater enhancement. (*Morrison*, *supra*, at pp. 220, 224.)

In the present case, all three section 12022.53 enhancements were alleged and found true by the jury. *Morrison* acknowledged that in such circumstances, "the striking of an enhancement under section 12022.53, subdivision (d) would leave intact the remaining findings, and an enhancement under the greatest of those provisions would be mandatory unless those findings were also stricken in the interests of justice." (*Morrison*, *supra*, 34 Cal.App.5th at p. 222.) Although we have disagreed with *Morrison*'s reasoning and conclusion with respect to a trial court's ability to substitute an *uncharged* lesser enhancement upon striking or dismissing a section 12022.53, subdivision (d) enhancement (*People v. Tirado* (2019) 38 Cal.App.5th 637, 640, 643-644, review granted Nov. 13, 2019, S257658), as have other intermediate courts (e.g., *People v. Garcia* (2020) 46 Cal.App.5th 786, 788, 790-794, review granted June 10, 2020, S261772; *People v. Yanez* (2020) 44 Cal.App.5th 452, 458-460, review granted Apr. 22, 2020, S260819), we have recognized that where all three section 12022.53 enhancements are

alleged and found true, a trial court has discretion to strike the section 12022.53, subdivision (d) enhancement and then either impose one of the other two enhancements or strike them as well (*People v. Tirado*, *supra*, 38 Cal.App.5th at p. 644, review granted).

## D.     *Franklin* **and Related Issues**

Defendants contend the matter must be remanded to afford them the opportunity to present evidence and information relevant to their eventual youth offender parole hearings, pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).  Washington additionally disputes the notion he is ineligible for such a hearing, but says if he is ineligible, then (1) section 3051, subdivision (h) violates equal protection, and (2) his sentence violates the proscriptions of the federal and state Constitutions against cruel and/or unusual punishment.  We reject defendants' claims.

Generally speaking, a person who was sentenced to a lengthy prison term for an offense committed when he or she was age 25 or younger, is entitled to a youth offender parole hearing.  (§ 3051, subd. (a)(1).)  When assessing a prisoner's suitability for parole, the parole board is required to "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner . . . ."  (§ 4801, subd. (c); see § 3051, subd. (f)(1).)

In *Franklin*, *supra*, 63 Cal.4th at pages 283 through 284, the California Supreme Court reasoned that the foregoing statutes "contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the [parole board's] consideration. . . .  Assembling . . . statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later . . . ."  (*Ibid*.)[36]

---

[36]     When first enacted, section 3051 applied to juveniles in the true sense of the word: offenders under age 18.  (Stats. 2013, ch. 312, § 4, eff. Jan. 1, 2014.)  The constitutional

The state high court concluded that Franklin, who was 16 years old when he committed murder, and who was sentenced before the decisions in *Miller* and *Caballero*, and before the enactment of sections 3051 and 4801 (*Franklin*, *supra*, 63 Cal.4th at p. 268), may not have had an adequate opportunity at sentencing "to make a record of mitigating evidence tied to his youth" (*id*. at p. 269). Accordingly, it remanded the matter not for resentencing, but to permit the trial court to determine "whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Id*. at p. 284.) If Franklin did not have sufficient opportunity, the trial court was empowered to receive pertinent evidence and information from both parties, with "[t]he goal of any such proceeding [being] to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the [parole board], years later, may properly discharge its obligation to 'give great weight to' youth-related factors [citation] in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' [citation]." (*Ibid*.)

Although little, if any, information contemplated by *Franklin* was presented at sentencing, we conclude defendants are not entitled to a remand. *People v. Woods* (2018) 19 Cal.App.5th 1080 is on point:

> "Unlike the defendant in *Franklin*, defendant was 19 years old at the time of his offense and thus he was not subjected to a sentence that violated constitutional principles prohibiting a minor from being sentenced to the functional equivalent of life without parole without considering how minors

underpinnings of the statute, as discussed in *Graham v. Florida* (2010) 560 U.S. 48, *Miller v. Alabama* (2012) 567 U.S. 460, and *People v. Caballero* (2012) 55 Cal.4th 262 (see *Franklin*, *supra*, 63 Cal.4th at p. 277), also distinguish between juveniles and adults. Our state Legislature has since expanded the scope of the statute, first to offenders under age 23 (Stats. 2015, ch. 471, § 1, eff. Jan. 1, 2016), and most recently to offenders age 25 or younger (Stats. 2017, ch. 675, § 1, eff. Jan. 1, 2018).

are different from adults and how those differences counsel against irrevocably sentencing a minor to a lifetime in prison. Moreover, unlike the defendant in *Franklin*, defendant was not sentenced at a time when youth offender parole hearings were not yet part of California law. Defendant *is* entitled to a youth offender parole hearing under . . . section 3051, but *not* because he was sentenced to the functional equivalent of life without parole for a crime committed when he was a minor. Rather, he is entitled to a youth offender parole hearing only because the California Legislature decided, effective beginning [o]n January 1, 2016, that youth offender parole hearings should be afforded to 'any prisoner who was 25 years of age or younger . . . .' [Citation.] Thus, unlike the situation in *Franklin*, when defendant was sentenced in this case . . . section 3051 was already in place and had already been amended to encompass offenders like him . . . 25 years of age or younger, and subdivision (c) of . . . section 4801 already identified the various factors to be considered at a youth offender parole hearing. Thus unlike the defendant in *Franklin*, defendant had both the opportunity and incentive to put information on the record related to a future youth offender parole hearing.

"Under these circumstances, there is no reasonable basis for concluding, as defendant argues, that defendant was denied a sufficient opportunity to put on the record the kinds of information that . . . sections 3051 and 4801, subdivision (c) deem relevant at a youth offender parole hearing." (*People v. Woods*, *supra*, 19 Cal.App.5th at pp. 1088-1090, italics added; accord, *People v. Medrano* (2019) 40 Cal.App.5th 961, 963; cf. *People v. Rodriguez* (2018) 4 Cal.5th 1123, 1131-1132; *In re Loza* (2018) 27 Cal.App.5th 797, 807; *People v. Jones* (2017) 7 Cal.App.5th 787, 819.)

That we find no reason to order a remand does not preclude Jacobs from making a pertinent record, however. In *In re Cook* (2019) 7 Cal.5th 439, 446-447, the California Supreme Court held that an offender whose conviction is final may file a motion in the trial court under section 1203.01 for the purpose of making a record to preserve evidence of youth-related factors. Accordingly, our rejection of Jacobs's *Franklin* claim is without prejudice to Jacobs "filing a motion in the trial court for a *Franklin* proceeding under the

57.

authority of section 1203.01" and *Cook*, *supra*, at page 460. (See *People v. Medrano*, *supra*, 40 Cal.App.5th at p. 963.)[37]

Washington stands in a different position. In pertinent part, subdivision (h) of section 3051 provides: "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age." Although Washington's age qualifies him as a youth offender, he was sentenced under the three strikes law. (§§ 667, subds. (b)-(i), 1170.12.) Accordingly, he is not eligible for a youth offender parole hearing. (*People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1164.)

Washington disagrees. He says section 3051 can reasonably be read to exclude from eligibility persons whose life sentences were generated under the three strikes law, i.e., a third-strike offender. Because he is a second-strike offender who received life terms under statutory provisions other than those contained in sections 667, subdivisions (b) through (i) and 1170.12, his argument runs, and because section 3051 is unclear, we should apply the rule of lenity and find him eligible for a youth offender parole hearing.

We are not persuaded. The express language of the first sentence of section 3051, subdivision (h) refers to "cases in which *sentencing* occurs" pursuant to the three strikes

---

[37] Jacobs says that if we find forfeiture for failure to object, then he received ineffective assistance of counsel. Technically, we have not found the issue forfeited. In any event, we will not resolve such a claim when it is made for the first time in a reply brief. (See *People v. Duff*, *supra*, 58 Cal.4th at p. 550, fn. 9.) Were we to reach the claim, we would reject it, because we do not know what information counsel might have presented and Jacobs can still present such information under section 1203.01 and *Cook*. Accordingly, the record on appeal establishes neither deficient performance nor prejudice. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1003; *People v. Kipp* (1998) 18 Cal.4th 349, 367; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

law (italics added), not to "cases in which a life sentence is imposed" pursuant to the three strikes law. Moreover, the language of the remainder of the first sentence makes it clear the Legislature knew how to distinguish between sentencing in general and an individual's controlling offense in particular.[38]

Without citation to any authority, Washington asserts: "Section 3051 was enacted to address parole eligibility on a life term. The statutory language should be interpreted to give effect to the Legislature's intent, which did not extend to exclusion of second strikers who happen to be subject to a life term for some other reason. In context it is only reasonable to interpret the ineligibility exception to apply only to persons whose life term was generated through the Three Strikes law."

But section 3051 does not address parole eligibility only for life terms. Subdivision (b)(1) of the statute specifies that the parole eligibility date for persons convicted of a controlling offense committed when the person was 25 years of age or younger and for which the sentence is a determinate term is during the person's 15th year of incarceration. A determinate term can be lengthy enough to trigger this provision without being the equivalent of a life term. Moreover, we have examined the legislative history of section 3051, which was added by Senate Bill No. 260 (2013-2014 Reg. Sess.) (Stats. 2013, ch. 312, § 4). It is clear the Legislature did not intend to narrow ineligibility in the way Washington contends, but rather always sought broadly to exclude from the law's coverage any otherwise eligible individual who was sentenced as a strike offender. (See, e.g., Sen. Com. on Public Safety, Rep. on Sen. Bill No. 260 (2013-2014 Reg. Sess.) as amended Apr. 4, 2013, p. 4, at <http://leginfo.legislature.ca.gov/faces/ billAnalysisClient.xhtml?bill_id=201320140SB260> [as of Oct. 29, 2020]; Assem. Com. on Public Safety, Rep. on Sen. Bill No. 260 (2013-2014 Reg. Sess.) as amended June 27,

---

[38] Subdivision (a)(2)(B) of section 3051 defines " '[c]ontrolling offense' " as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment."

59.

2013, p. 2, at <http://leginfo.legislature.ca.gov/faces/

billAnalysisClient.xhtml?bill_id=201320140SB260> [as of Oct. 29, 2020]; Sen. Com. on

Public Safety, Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 260

(2013-2014 Reg. Sess.) as amended Sept. 3, 2013, p. 2, at

<http://leginfo.legislature.ca.gov/faces/

billAnalysisClient.xhtml?bill_id=201320140SB260> [as of Oct. 29, 2020].)

" ' "[T]he most reliable indicator of legislative intent" ' is generally the language

of a statute . . . ." (*In re Jones* (2019) 42 Cal.App.5th 477, 482.)  Here, the express

language of section 3051, subdivision (h) excludes from youth offender parole hearings

cases in which "sentencing" occurs pursuant to the three strikes law.  Washington was

sentenced pursuant to the three strikes law.  Although that law was not the genesis of his

life terms, neither the statutory language nor the ascertainable legislative intent requires

that he have been sentenced to a life term as a third-strike offender.  Nor does the rule of

lenity assist him.  " 'The rule of statutory interpretation that ambiguous penal statutes are

construed in favor of defendants is inapplicable unless two reasonable interpretations of

the same provision stand in relative equipoise, i.e., that resolution of the statute's

ambiguities in a convincing manner is impracticable.'  [¶]  Thus, although true

ambiguities are resolved in a defendant's favor, an appellate court should not strain to

interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative

intent." (*People v. Avery* (2002) 27 Cal.4th 49, 58.)  Here, the "contrary legislative

intent" is undeniable.

Washington says that without youth offender parole eligibility, his sentence

violates federal and state constitutional equal protection guarantees.[39]  Relying primarily

on *People v. Edwards* (2019) 34 Cal.App.5th 183 (*Edwards*), he contends section 3051,

---

[39]     We permitted Washington to file a very belated supplemental brief raising this
issue.

60.

subdivision (h) violates the equal protection clauses of the federal and state Constitutions by excluding young adults convicted and sentenced for a second strike offense from youth offender parole consideration, while young adults convicted of first degree murder are entitled to such consideration. We conclude the claim lacks merit.[40]

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws." (*Edwards*, *supra*, 34 Cal.App.5th at p. 195.) "The California equal protection clause offers substantially similar protection to the federal equal protection clause" (*People v. Laird* (2018) 27 Cal.App.5th 458, 469), and our analysis applies to both (see *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 572).

To succeed on an equal protection claim, a defendant "must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. [Citation.]" (*Edwards*, *supra*, 34 Cal.App.5th at p. 195.) "We consider

---

[40] The Attorney General argues the claim was forfeited because it was not raised in the trial court. (See, e.g., *People v. Alexander* (2010) 49 Cal.4th 846, 880, fn. 14; *People v. Rogers*, *supra*, 39 Cal.4th at p. 854; *People v. Carpenter* (1997) 15 Cal.4th 312, 362, abrogated on another ground in *People v. Diaz*, *supra*, 60 Cal.4th at p. 1190 & superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.) We agree. Equal protection principles are well known among attorneys practicing criminal law, and claimed violations of equal protection are common where, as here, a statute carves out an exception that is perceived as detrimental to the defendant. Although *Edwards* may have been the first authority for the proposition subdivision (h) of section 3051 violates equal protection, the opinion did not " 'dramatically depart[] from prior [equal protection] clause case law' " (*People v. Pearson* (2013) 56 Cal.4th 393, 462). Thus, it did not "represent[] an unforeseen change in the law 'that competent and knowledgeable counsel reasonably could [not] have been expected to have anticipated' " at sentencing. (*Ibid*.; see *People v. Edwards* (2013) 57 Cal.4th 658, 704-705.)

Nevertheless, we have discretion to address constitutional issues raised on appeal where the issue presented is a pure question of law that turns on undisputed facts. (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.) We exercise that discretion here to forestall a future claim of ineffective assistance of trial counsel.

whether the identified groups are similarly situated for the purposes of the challenged law.  [Citations.]” (*People v. Laird*, *supra*, 27 Cal.App.5th at p. 469.)

“If groups are similarly situated but treated differently, the state must then provide a rational justification for the disparity.  [Citation.]” (*People v. Lynch* (2012) 209 Cal.App.4th 353, 458.)

> “A criminal defendant has no vested interest ‘ “in a specific term of imprisonment or in the designation a particular crime receives.” ’ [Citation.]  It is both the prerogative and the duty of the Legislature to define degrees of culpability and punishment, and to distinguish between crimes in this regard.  [Citation.]  Courts routinely decline to intrude upon the ‘broad discretion’ such policy judgments entail.  [Citation.]  Equal protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law.  [Citation.]
>
> “Under these principles, equal protection of the law is denied only where there is no ‘rational relationship between the disparity of treatment and some legitimate governmental purpose.’  [Citation.]  In other words, the legislation survives constitutional scrutiny as long as there is ‘ “any reasonably conceivable state of facts that could provide a rational basis for the classification.” ’  [Citation.]  This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.  Nor must the underlying rationale be empirically substantiated.  [Citation.]  While the realities of the subject matter cannot be completely ignored [citation], a court may engage in ‘ “rational speculation” ’ as to the justifications for the legislative choice [citation].  It is immaterial for rational basis review ‘whether or not’ any such speculation has ‘a foundation in the record.’  [Citations.]” (*People v. Turnage* (2012) 55 Cal.4th 62, 74-75.)

“We review an equal protection claim de novo.  [Citation.]” (*People v. Laird*, *supra*, 27 Cal.App.5th at p. 469.)

Subdivision (h) of section 3051 carves out exceptions to youth offender parole eligibility for young adults sentenced under the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and the one strike law (§ 667.61).  *Edwards* found an equal protection violation with respect to the exclusion of one strike offenders, because, it concluded, such offenders are similarly situated to first degree murderers (who are not excluded from

eligibility) and there is no rational relationship between the disparity of treatment and a legitimate governmental purpose. (*Edwards*, *supra*, 34 Cal.App.5th at pp. 194-195, 197.) Not all courts have agreed with *Edwards*'s finding of no rational relationship, and the question whether the statute violates equal protection is currently pending before the California Supreme Court. (*People v. Williams* (2020) 47 Cal.App.5th 475, 492-493, review granted July 22, 2020, S262229.)

We need not take a position on whether one strike offenders can constitutionally be excluded from youth offender parole eligibility, because Washington was sentenced under the three strikes law. Although he has only one prior strike conviction, he is not similarly situated to a hypothetical young adult — even a murderer — who has no prior strike convictions. (See *People v. Spears* (1995) 40 Cal.App.4th 1683, 1686, 1687.)

Even if we were to find the "similarly situated" threshold met, we would still reject Washington's claim of an equal protection violation. This is so because he did not — and, in our view, cannot — "negate every possible, plausible grounds [*sic*] for the disputed disparity . . . ." (*People v. Turnage*, *supra*, 55 Cal.4th at p. 75.)

"Statutes that punish recidivists more severely than first offenders have a long tradition in this country that dates back to colonial times. [Citations.] [¶] States have a valid interest in deterring and segregating habitual criminals. [Citation.]" (*Parke v. Raley* (1992) 506 U.S. 20, 26-27.) "The purpose of section 3051 is 'to give youthful offenders "a meaningful opportunity to obtain release" after they have served at least 15, 20, or 25 years in prison [citation] and made " 'a showing of rehabilitation and maturity' " ' and 'to account for neuroscience research that the human brain — especially those portions responsible for judgment and decisionmaking — continues to develop into a person's mid-20[']s.' [Citation.] Assuming a Three Strikes youth offender is similarly situated to other youth offenders for purposes of section 3051, the Legislature could rationally determine that the former — 'a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal

justice system' [citation] — presents too great a risk of recidivism to allow the possibility of early parole." (*People v. Wilkes*, *supra*, 46 Cal.App.5th at p. 1166.)

*Edwards* does not support a different conclusion. As that court observed, "The 'One Strike' law is an alternative, harsher sentencing scheme that applies to specified felony sex offenses" (*Edwards*, *supra*, 34 Cal.App.5th at p. 192), such that " 'a first-time offense can result in one of two heightened sentences' " (*id*. at p. 193). Thus, the court noted "that criminal history plays no role in defining a One Strike crime," and it viewed the problem as the exclusion of "an entire class of youthful offenders convicted of a crime short of homicide . . . , regardless of criminal history . . . ." (*Id*. at p. 199.) "The distinguishing characteristic of Three Strikes offenders, of course" — even those who, like Washington, have only one prior strike conviction — "is that they are not being sentenced for a first-time offense. Thus, the ample authority rejecting equal protection challenges from Three Strikes offenders did not apply in *Edwards*." (*People v. Wilkes*, *supra*, 46 Cal.App.5th at pp. 1166-1167.)

Washington further says that if he is not eligible for a youth offender parole hearing, then his sentence constitutes cruel and/or unusual punishment in violation of the federal and state Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17; cf. *Franklin*, *supra*, 63 Cal.4th at p. 268.) In light of our remand to permit the trial court to exercise its discretion with regard to the firearm enhancements, this claim is premature. If Washington wishes to pursue it, he should raise it in the trial court when those enhancements are addressed. (See *People v. Baker* (2018) 20 Cal.App.5th 711, 720; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247-1248; *People v. Russell* (2010) 187 Cal.App.4th 981, 993; *People v. Norman* (2003) 109 Cal.App.4th 221, 229; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)

E.      **Ability to Pay Fees, Fines, and Assessments**

Last, defendants contend that unless supported by a determination of ability to pay, fees, fines, and assessments imposed at sentencing are unconstitutional. We

conclude defendants forfeited their claims by failing to raise them at sentencing, and the claims lack merit in any event.

As previously described, the trial court imposed the statutory maximum restitution fine (§ 1202.4, subd. (b)) of $10,000, a court operations assessment (§ 1465.8) of $280, and a court facilities funding assessment (Gov. Code, § 70373, subd. (a)(1)) of $210 on each defendant.[41] Defendants did not object to these amounts, which were among the recommendations contained in the probation officer's reports.

Defendants contend the court improperly imposed these fines and assessments without determining whether defendants had the ability to pay those amounts, in violation of defendants' due process rights; hence, the monetary obligations must be stayed.[42] Defendants' argument is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which was decided after their sentencing hearings and while their appeals were pending. *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees. (*Id.* at pp. 1164, 1167.)

---

[41] The calculation of the assessments was incorrect as to Jacobs, who was convicted on six counts, not seven counts as was Washington. As to Jacobs, an assessment in the amount of $240 should have been imposed pursuant to section 1465.8, and an assessment in the amount of $180 should have been imposed pursuant to Government Code section 70373. Although the amounts are correctly shown on Jacobs's abstract of judgment, because the abstract of judgment is not the judgment itself (*People v. Mitchell* (2001) 26 Cal.4th 181, 185), we find it appropriate to modify the judgment as to Jacobs to reflect the correct amounts.

[42] The question whether a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments and, if so, which party bears the burden of proof regarding the defendant's ability to pay, is currently pending review before the California Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

We conclude defendants are not entitled to relief. The situation presented in *Dueñas* is markedly distinguishable from the facts of defendants' case. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054-1055 (*Lowery*); see also *People v. Son* (2020) 49 Cal.App.5th 565, 599-601 (conc. & dis. opn. of Franson, Acting P.J.).)

Moreover, even assuming *Dueñas* applies to this case, defendants have forfeited any challenge to their alleged inability to pay the monetary obligations that were imposed. The court ordered them to pay statutory maximum restitution fines of $10,000 each under section 1202.4, subdivision (b). When the court imposes a restitution fine greater than the statutory minimum of $300, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*); accord, *Lowery*, *supra*, 43 Cal.App.5th at pp. 1053-1054; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073 (*Aviles*).)

While *Dueñas* had not been decided at the time of defendants' sentencing hearings, defendants had the statutory right to object to the $10,000 restitution fines and demonstrate their inability to pay, and such an objection "would not have been futile under governing law at the time of [their] sentencing hearing[s]." (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154; accord, *Lowery*, *supra*, 43 Cal.App.5th at p. 1054; *Aviles*, *supra*, 39 Cal.App.5th at pp. 1073-1074; see *People v. Nelson* (2011) 51 Cal.4th 198, 227.) Nor would objections to the assessments imposed under section 1465.8 and Government Code section 70373 have been futile. "Although both statutory provisions mandate the assessments be imposed, nothing in the record of the sentencing hearing[s] indicates that [either defendant] was foreclosed from making the same request that the defendant in *Dueñas* made in the face of those same mandatory assessments. [Either defendant] plainly could have made a record had his ability to pay actually been an issue. Indeed, [each] was obligated to create a record showing his inability to pay the . . . restitution fine, which would have served to also address his ability to pay the assessments."

(*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154; accord, *Aviles*, *supra*, 39 Cal.App.5th at p. 1074.)

Even if we agreed with *Dueñas* and *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 and concluded defendants did not forfeit the issue, we would still reject their constitutional claims for the reasons stated in *Lowery*, *supra*, 43 Cal.App.5th at pages 1056 through 1057 (no due process violation), 1057 through 1058 (no gross disproportionality under 8th Amend. to the U.S. Const.), and 1058 through 1060 (no equal protection violation). We would further find that any error in the trial court's failure to conduct a hearing on their ability to pay was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Aviles*, *supra*, 39 Cal.App.5th at p. 1075.) According to the undisputed statements in the probation officer's reports, defendants are young and in good health, and have the ability to gain employment while in prison. We can infer they have the ability to pay their monetary obligations from probable future wages, including prison wages, while they serve their lengthy prison terms. (*Lowery*, *supra*, 43 Cal.App.5th at p. 1060; *Aviles*, *supra*, 39 Cal.App.5th at pp. 1076, 1077; accord, *People v. Son*, *supra*, 49 Cal.App.5th at pp. 603-604 (conc. & dis. opn. of Franson, Acting P.J.).)

The Attorney General says that because Washington is entitled to have his case remanded to allow the trial court to consider striking any or all of his section 667, subdivision (a) enhancements, we should also remand so Washington can request a hearing and present evidence demonstrating his inability to pay the monetary obligations. (See *People v. Castellano*, *supra*, 33 Cal.App.5th at p. 491.) We decline to include the ability-to-pay issue in our remand order. Because the issue was forfeited, no remand is required. (*People v. Avila* (2009) 46 Cal.4th 680, 729.) The monetary obligations will not be affected in any way by the trial court's decision with respect to the prior serious felony enhancements, as they would be if, for example, we were reversing any of Washington's convictions. Accordingly, we see no reason to require the expenditure of

67.

additional judicial resources merely because the trial court is being directed to address a separate, unrelated issue. (See, e.g., *People v. Keene* (2019) 43 Cal.App.5th 861, 864, 865; *Aviles*, *supra*, 39 Cal.App.5th at p. 1077; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033-1034.)

**DISPOSITION**

As to Jacobs, the judgment is modified to provide for imposition of a court operations assessment (§ 1465.8) in the amount of $240, and a court facilities funding assessment (Gov. Code, § 70373) in the amount of $180. As so modified, the judgment is affirmed, without prejudice to Jacobs's filing a motion for a *Franklin* proceeding under the authority of section 1203.01 and *In re Cook*, *supra*, 7 Cal.5th at page 460. The matter is remanded to the trial court with directions to exercise its discretion under sections 12022.5, subdivision (c) and 12022.53, subdivision (h), as amended by Senate Bill No. 620 (Stats. 2017, ch. 682, §§ 1-2, eff. Jan. 1, 2018), and, if appropriate following exercise of that discretion, to resentence Jacobs accordingly. The trial court shall cause to be prepared an amended abstract of judgment that reflects any change in sentence, and shall further cause a certified copy of same to be transmitted to the appropriate authorities.

As to Washington, the judgment is affirmed. The matter is remanded to the trial court with directions to exercise its discretion under sections 667, subdivision (a)(1) and 1385, as amended by Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1013, §§ 1-2, eff. Jan. 1, 2019) and under sections 12022.5, subdivision (c) and 12022.53, subdivision (h), as amended by Senate Bill No. 620 (Stats. 2017, ch. 682, §§ 1-2, eff. Jan. 1, 2018), and, if appropriate following exercise of that discretion, to resentence Washington accordingly. The trial court shall cause to be prepared an amended abstract of judgment that reflects any change in sentence, and, if no change, reflects that the enhancement pursuant to section 667, subdivision (a) was stayed with respect to counts 2

and 5; and the trial court shall cause a certified copy of same to be transmitted to the appropriate authorities.

DETJEN, Acting P.J.

I CONCUR:

FRANSON, J.

SMITH, J., Concurring and Dissenting.

I disagree with the majority's resolution of defendants' claims under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  I would permit defendants to raise their *Duenas* claims on remand for resentencing, as the Attorney General proposes.  However, in keeping with *People v. Son* (2020) 49 Cal.App.5th 565 (lead opn. of Smith, J.), I would find that defendants are entitled, as a matter of constitutional right, to a determination of ability to pay only with regard to the court operations assessment pursuant to Penal Code section 1465.8 and the court facilities funding assessment pursuant to Government Code section 70373.  In all other respects I concur with the majority and vote to affirm.


                                             SMITH, J.